# EXHIBIT "B"

**Expert Report of Clark D. Cunningham**

I.  Background

A.   Qualifications

1.  I am the Director of the National Institute for Teaching Ethics & Professionalism, and Professor of Law and holder of the W. Lee Burge Chair in Law and Ethics at the Georgia State University College of Law.

2.  A true and correct copy of my curriculum vitae is attached to this Affidavit. (Attachment 1)

3.  Also attached is a list of cases in which I have testified as an expert witness in court or in deposition over the past four years. (Attachment 2)

4.  I am an active member in good standing of the State Bar of Georgia and have been licensed to practice law in Georgia since 2002. I have been a licensed attorney since 1981.

5.  I have served as a Special Master, appointed by the Supreme Court of Georgia, to exercise general supervision over the lawyer disciplinary proceeding assigned to me and to make findings of fact and conclusions of law as to whether discipline should be imposed.

6.  I am a member of the Chief Justice of Georgia's Commission on Professionalism and previously served as Co-Reporter to the Georgia Chief Justice's Commission on Indigent Defense and Reporter to the Student Practice Committee of the Georgia Board of Bar Examiners.

7.  I have testified previously as an expert witness on legal ethics, including in matters before the courts of the State of Georgia.

8.  My home office is located at 845 Ashland Avenue NE, Atlanta, Fulton County, Georgia.

9.  My base hourly rate for this case is $450/hour. I charge $525/hour for trial and deposition

**MII EXP RPT 0006**

testimony, including time waiting to testify, and for expedited work. The compensation

charged in connection with my work on this matter is based on actual hours incurred and is

not in any way contingent upon the opinions expressed herein or the results of this litigation.

10. I am not a party to any action involving any of the parties to this case and am competent to

testify as to the expert opinions set forth in this Report, as based on the assumptions stated

below.


B. Summary of Opinions.

It is my opinion that the conduct of defendants James Fisher and Hall Booth Smith, P.C. in

their defense of Monitronics Inc. against the claims of Velma Veasley failed to meet the

standard of care for attorneys licensed in Georgia due to:

1. The failure to consult with Monitronics as to the means by which its objectives were to be

pursued in relation to whether the case should be removed to federal court and whether to file

Daubert motions

2. The failure to explain to the extent reasonably necessary to make informed decisions

regarding removal to federal court, filing notices apportioning fault, filing Daubert motions,

and Fisher's misconduct in relation to the Giacalone deposition.

3. The failure to comply promptly with Monitronics' reasonable request for information about

monetary sanctions to be imposed as a result of Fisher's misconduct in relation to the

Giacalone deposition.

4. Continuing to represent Monitronics without disclosure of the malpractice committed during

representation and without obtaining consent after such disclosure in compliance with

Georgia Rule of Professional Conduct 1.7.

5. Attempting to conceal Fisher's misconduct in relation to the Giacalone deposition through dishonesty, deceit and misrepresentation before Judge Hydrick on August 2, 2011; such dishonesty, deceit and misrepresentation was so grave as to warrant suspension from practice.

## II. Documents Reviewed.

I have reviewed the following in preparing this report.

1. The depositions of James Fisher and Denise Spitalnick. I also reviewed all of the exhibits referenced in those depositions with the exceptions of Plaintiff's Exhibits 57 (deposition of John Colehower), 68 (deposition of Velma Veasley), and 70 (notes regarding deposition of Velma Veasley).

2. The Affidavit of Barry L Katz executed on November 6, 2015.

3. The Complaint filed in this matter.

4. The Expert Report of Stanley M. Karsman.

5. The documents specifically mentioned below.

## III. Assumptions used in forming expert opinions

1. On October 23, 1998 Velma Veasley (Veasley) contracted with Tel-Star Alarms, Inc. (Tel-Star) to install a security system in her home and to provide alarm monitoring services.

2. Beginning in 1998, Tel-Star assigned its alarm monitoring obligations to Monitronics, Inc.

3. At all relevant times:

a. Veasley was a resident of DeKalb County, State of Georgia.

**MII EXP RPT 0008**

b.  Tel-Star was a Georgia Corporation with its principal place of business in DeKalb County, State of Georgia.

c.  Monitronics was a Texas Corporation with its principal place of business in the State of Colorado.

4.  On March 29-30, 2006 Veasley was the victim of a sexual assault.

5.  On March 28, 2008 Veasley filed suit in the U.S. District Court for the Northern District of Georgia against Tel-Star, Monitronics, the DeKalb County Police Department, Police Officer Terrell Bulton, and "John Doe Officers" of the DeKalb County Police Department, alleging that defendants' negligence was the proximate cause of injuries allegedly suffered as a result of the 2006 sexual assault. Plaintiff's Deposition Exhibit (PX) 4.

6.  Hall Booth Smith, P.C. (HBS) is a law firm based in Atlanta, Georgia.   James H. Fisher, II (Fisher) and Denise W. Spitalnick (Spitalnick) are licensed attorneys in Georgia and members of the HBS law firm.

7.  On May 12, 2008 Charlotte Wynder (Wynder), Claims Specialist for the First Mercury Insurance Company (Mercury), notified Fisher that he and HBS were being retained to represent Monitronics in the federal case. PX 1. Jeff Turner was also a claims specialist with First Mercury with responsibility for the Veasley case.

8.  Wynder provided Fisher with contact information for Ben Dyer (Dyer), of the law firm Culp, Dyer & Halpern (CDH), Denton, Texas (identified as corporate Counsel for Monitronics), and Mercury's Litigation Guidelines.   PX 1.

9.  HBS and Fisher appeared as counsel of record in the 2008 federal lawsuit on behalf of Monitronics.

**MII EXP RPT 0009**

10. Steve Hedrick, Vice President, Finance, and Rick Hudson, Vice President, Customer Services, were representatives of Monitronics authorized to communicate with HBS regarding the Veasley case.

11. On May 30, 2008 Fisher emailed Peggy Carlson (Carlson), another attorney with the CDH law firm representing Monitronics, a one paragraph report on his work on the case to date. The email was copied to Dyer, Hedrick and Wynder. PX 6.

12. On June 18, 2008 Fisher emailed a one paragraph report to Wynder on the initial status conference in the federal case.   Although he reported that "TelStar did not participate pending appearance of an attorney to be retained by them", he stated "I anticipate" that Tel-Star will file a motion for summary judgment.   He did not indicate what the grounds would be of a Tel-Star motion for summary judgment or why he anticipated it would file such a motion. The email was copied to Dyer, Hedrick, Carlson and Spitalnick. PX 8.

13. On July 2, 2008 Fisher emailed a two paragraph report to Wynder, copied to Dyer, Carlson, Hedrick and Spitalnick. He stated that, although "I much prefer federal court," the federal case would eventually be dismissed for lack of diversity jurisdiction because the joinder of DeKalb County and Tel-Star as defendants destroyed diversity.   He predicted that after dismissal of the federal case, Veasley would refile in DeKalb Superior Court against DeKalb County and Tel-Star as well as Monitronics.   "DeKalb will eventually be dismissed on sovereign immunity leaving only TelStar and Monitronics.   Of course, TelStar will also get out in time. At that point, we will 'remove' back to federal court".   Fisher did not explain the basis for his prediction: "Of course, TelStar will also get out in time."   PX12.

14. On July 23, 2008 Jim Hardina (Hardina), Claims Specialist for Scottsdale Insurance Company

**MII EXP RPT 0010**

(Scottsdale), notified Fisher that Scottsdale provided excess liability coverage to Monitronics and requested a "current update" on the Veasley litigation.   PX 13.

15.  On July 23, 2008 Fisher emailed a four paragraph report to Hardina, copied to Wynder, Dyer, Carlson, Hedrick and Spitalnick. He stated, if the case is refiled in state court, DeKalb County would be dismissed on grounds of sovereign immunity.   He further stated: "There is no basis for liability against TelStar because the contract and all responsibility for monitoring was assigned to Monitronics. …. *There is no claim that the alarm system* did not function properly or *was improperly installed.   Therefore*, both TelStar and DeKalb County will be dismissed from the action if filed in state court and they are named as defendants.   *At that point*, Monitronics will be able to remove the matter back to federal court. … This is recommended …" PX 13 (emphasis added).

16.  On August 15, 2008, Spitalnick sent Wynder the "90 Day Suit Report," and copied Fisher. In Section 3, Liability, she stated: "Upon dismissal [from federal court], plaintiff will refile in Dekalb County.   Defendant Dekalb County Police Department will file a motion to dismiss claiming sovereign immunity and Tel-Star will file a motion for summary judgment claiming that it was not involved in the monitoring of the subject alarm since it assigned its contract with the plaintiff to Monitronics well in advance of the incident date. After Dekalb County Police Department and Tel-Star are not [sic] longer parties there will be complete diversity among the remaining parties, Monitronics and Plaintiff. At which point we will file a motion to transfer venue [sic] back to USDC [U.S. District Court]."   PX 14.

17.  In response to a request for a case status update, on September 3, 2008 Fisher emailed a one paragraph report to Dyer stating: "Upon refiling in state court, the County will be dismissed on

motion based on sovereign immunity *at which time* we will remove to fed. ct. [federal court] and file our msj [motion for summary judgment]." Fisher did not mention the likelihood that Tel-Star would also be named in a refiled state court case, thus destroying diversity even if the County were dismissed.   PX 15 (emphasis added).

18.  On September 4, 2008 Fisher emailed to Wynder, copying Spitalnick, his September 3 report to Dyer, and further stated: "As long as the County is in the case and the police chief and officers, there is no diversity jurisdiction". Fisher did not mention that the joinder of Tel-Star as a co-defendant also destroyed diversity.   PX 16

19.  On September 9, 2008 Fisher emailed Wynder a summary of "status and strategy" at her request, copying Dyer, Carlson, Hedrick and Spitalnick. He stated that when the case was dismissed in federal court and refiled in state court, "DeKalb County and the individual police officers will file motions for summary judgment based on sovereign immunity ad will be dismissed. *At that point diversity jurisdiction will be created* and we can remove the case back to federal court." PX 17 (emphasis added).   Fisher did not mention the likelihood that Tel-Star would also be named in a refiled state court case, thus destroying diversity even if the County and police officers were dismissed.

20.  On October 15, 2008 Fisher updated the "90 Day Suit Report." PX 19.

a.  Section 3, Liability, stated:   "Upon dismissal [from federal court], plaintiff will refile in Dekalb County.   Defendant Dekalb County Police Department will file a motion to dismiss claiming sovereign immunity and Tel-Star will file a motion for summary judgment claiming that it was not involved in the monitoring of the subject alarm since it assigned its contract with the plaintiff to Monitronics well in advance of the incident date. After Dekalb County

Police Department and Tel-Star are not [sic] longer parties there will be complete diversity among the remaining parties, Monitronics and Plaintiff. At which point we will file a motion to transfer venue [sic] back to USDC [U.S. District Court]."   PX 19.

21.  Section 10, Work to be Done and When, stated: "Upon dismissal of federal case, plaintiff will have to refile in DeKalb Court. Once filed, DeKalb County will be dismissed on grounds of sovereign immunity. Once the County is out of the case, the federal court can have jurisdiction and the case will be removed from state court." PX 19.   This section failed indicate any "work to be done" to address the likelihood that Tel-Star would also be named in a refiled state court case, thus destroying diversity even if the County and police officers were dismissed.

22.  On November 1, 2008 counsel for Tel-Star moved to withdraw in the federal case. No arrangement for substitute counsel was indicated.   PX 21.

23.  On December 18, 2008 Fisher emailed a one paragraph report to Hardina, copied to Wynder, and Spitalnick, indicating that he had filed on behalf of Monitronics a motion to dismiss the federal case for lack of diversity jurisdiction. He stated that once the case is "remanded [sic]" to state court, "Ultimately the county and individual police officers should be dismissed on Sovereign Immunity.   *At that time diversity jurisdiction will exist and the case can be removed* back to fed. [federal] court properly." PX 22 (emphasis added). Fisher did not mention the likelihood that Tel-Star would also be named in a refiled state court case, thus destroying diversity even if the County and police officers were dismissed.   Fisher also failed to report that counsel for Tel-Star had withdrawn and thus failed to analyze the effect of that development on his prior predictions that Tel-Star would file a motion for summary judgment if the case was refiled in state court.

**MII EXP RPT 0013**

24.  On April 15, 2009 Fisher reported to Dye, Turner, Hedrick and Carlson that the federal case had been dismissed. He stated: "Plaintiff will be able to file in state court *until the county is dismissed on sovereign immunity.   At that time our motion for summary judgment will be ripe for filing*.   I recommend removal to federal court *upon dismissal of the county* to be followed by the filing of our msj [motion for summary judgment]."   PX 23 (emphasis added). Fisher did not mention the likelihood that Tel-Star would also be named in a refiled state court case, thus destroying diversity even if the County and police officers were dismissed.   Fisher also failed analyze how the fact that counsel for Tel-Star had withdrawn in the federal case would affect his prior predictions that Tel-Star would file a motion for summary judgment if the case was refiled in state court.

a.  On April 15, 2009 Dyer responded to Fisher's email stating: "I need some further clarification – your email below seems to assume that the county will file a pleading asserting sovereign immunity before our deadlines run for removal of the case, correct?" PX 25.

b.  Fisher replied on the same date: "You are correct. We will not be able to remove *as long as the County (and individual police officers) are still in the case* because there would be no diversity.   Only once the locals are out will we be able to remove and proceed from there. The individual officers will be dismissed along with the County as long as sovereign immunity applies." PX 25 (emphasis added).

25.  On August 24, 2009 Spitalnick emailed Dyer, Carlson, Turner, Hedrick and Hardina a copy of the complaint filed against Monitronics in DeKalb Superior Court on August 18, 2009. PX 28. She copied the email to Fisher.

a.  Contrary to the predictions of Fisher, no DeKalb County defendants were named.

**MII EXP RPT 0014**

b.  The only defendants were Monitronics, Tel-Star, and 3 "John Does" who "marketed, sold, installed, and/or monitored" Veasley's home security system.

c.  Spitalnick's email incorrectly stated that Monitronics' answer to the complaint was due two months rather than one month after acknowledgment of service. See PX 39 (8/29/09 email from Spitalnick to Carlson).

26.  Both prior to and during the first 30 days after the refiling of the Veasley case in state court, representatives of Monitronics communicated to Fisher their desire to be consulted about whether to file for removal within the first 30 days after service of the state court complaint. Fisher failed to consult with Monitronics, despite these requests, and allowed the 30 day period to expire without filing a notice of removal.

27.  Prior to the expiration of the 30 day period for removal after receipt of the complaint, Fisher was aware that:

a.  Tel-Star was no longer in business

b.  The former owner of Tel-Star had no income or resources

c.  The attorney who had entered an appearance for Tel-Star in the federal case had withdrawn because he had difficulty getting paid.

See Attachment 3 (email from Fisher to Dyer and Carlson dated 10/30/09 and email from Fisher to Turner dated 11/2/09).

28.  On October 30, 2009 Fisher sent a one paragraph email to Dyer, Turner, Hedrick and Carlson, copied to Spitalnick, reporting that the former owner of Tel-Star planned to file an answer on behalf of Tel-Star in violation of the requirement in Georgia that a corporation can only be represented by an attorney, thus creating the possibility of a default judgment against Tel-Start.

**MII EXP RPT 0015**

PX 30

a. Fisher further stated: "The significance of this development is that this will adversely affect removal of the case to federal court which would be possible if TelStar were dismissed on summary judgment."

b.   As of this time no HBS attorney had provided Monitronics any written information about the risks of continued representation by HBS due to the failure to consult with Monitronics about whether to file notice of removal within 30 days after the receipt of the state court complaint.

29.  On November 2, 2009 Fisher sent an email to Turner, responding to his voicemail message, stating: "Regarding the effect of default on removal, TelStar is a Georgia corporation and therefore a resident of Ga. [Georgia]. The presence of a Ga. corp. [corporation] as co-defendant prevents complete diversity and is a bar to our removal to federal court. Our plan has been to remove the case to federal court once complete diversity is created by the dismissal of TelStar on summary judgment (eliminating the Ga. resident defendant and thereby creating diversity needed for removal.) If default is entered against TelStar, it will not be dismissed and diversity for removal will not exist." Attachment 3.

30.  As November 2, 2009, no HBS attorney had provided Monitronics any written information about the risks of continued representation by HBS due to the failure to consult with Monitronics about whether to file notice of removal within 30 days after the receipt of the state court complaint.

31.  On December 16, 2009 Spitalnick sent a one-paragraph email to Turner, copied to Fisher, stating that David Smith (the same attorney who had previously withdrawn in the federal case) had entered an appearance and filed an appearance on behalf of Tel-Star. PX 66

**MII EXP RPT 0016**

a.  She further stated: "Smith indicated to me that he was going to be filing a motion for summary judgment on Tel-Star's behalf based on the fact that Tel-Star was not involved with the monitoring of plaintiff's house at the time of the incident."

b.  In this email, Spitalnick failed to mention that the state complaint also alleged that Tel-Star had negligently installed the alarm system and failed to provide Veasley neither the quality of service nor the security described in its marketing materials or by its marketing or sales personnel.

32.  On January 4, 2010 Spitalnick sent a one-paragraph email to Hardina, responding to his request for a case update, and stated: "Counsel for Tel-Star has indicated to me that he is going to be filing a motion for summary judgment on Tel-Star's behalf based on the fact that Tel-Star was not involved with the monitoring of plaintiff's residence when the subject incident. If Tel-Star's motion is granted we can remove the case to federal court". Attachment 4. In this email, Spitalnick failed to mention that the state complaint also alleged that Tel-Star had negligently installed the alarm system and failed to provide Veasley neither the quality of service nor the security described in its marketing materials or by its marketing or sales personnel.

33.  On April 1, 2010 Fisher sent a one paragraph email to Turner, copied to Dyer and Spitalnick, stating: "Telstar counsel intends to send Plaintiff a 'frivolous litigation' notice pursuant to statute demanding dismissal of Telstar as a party (permitting a claim for attorney fees if refused) to be followed by motion for summary judgment if dismissal is not forthcoming." PX 33.

34.  On June 3, 2010 counsel for Tel-Star moved to withdraw in DeKalb Superior Court. No arrangement for substitute counsel was indicated.   PX 21

**MII EXP RPT 0017**

35. At no point after June 3, 2010 did any HBS attorney provide Monitronics any written information about the risks of continued representation by HBS due to the failure to consult with Monitronics about whether to file notice of removal within 30 days after the receipt of the state court complaint.

36. At no point prior to August 25, 2010 did any attorney with HBS provide Monitronics with written notice regarding the provisions of 28 USC 1446 limiting removal of a case on the basis of diversity jurisdiction more than one year after commencement of the action.

37. On March 3, 2011 a Scheduling Order was entered by the DeKalb County Superior Court indicating the pretrial conference would be held in August 2011. PX 37.

38. On March 10, 2010 Spitalnick filed a Notice Pursuant to OCGA §51-12-33 that Monitronics "plans to apportion fault" to the DeKalb County Board of Commissioners, Terrell Bolton, Terry R. Singleton and Aaron E. Alexander. PX 32.

39. On July 12, 2011 Fisher filed a Notice Pursuant to OCGA §51-12-33 that Monitronics "plans to apportion fault" to Stephen Okrah (the perpetrator of the assault against Veasley). PX 45.

40. On July 12, 2011 Spitalnick emailed a report to Turner, copied to Dyer, Carlson and Fisher, that the case was on the pretrial calendar for August 2, 2011 and that cases "that appear on the August 2nd pretrial calendar will be tried sometime in October, 2012 [sic]." PX 44.

41. On July 20, 2011 Spitalnick replied to an email from Carlson asking "what do we need to do to go about identifying any responsible third parties and when does that need to be filed?"   PX 48.

a. Spitalnick's response, copied to Culp and Fisher, stated "Yes there is an apportionment statute in Georgia and we filed *a notice of apportionment* naming Dekalb county police, the officers

and Okrah." PX 48 (emphasis added)

b.  In fact, as of July 20, 2011, HBS had filed *two* notices of apportionment separated in time by more than a year.

c.  Spitalnick did not disclose that the notice of apportionment naming Okrah had only been filed 8 days earlier, on July 12, 2011, and was subject to a motion to strike if the trial date was less than 120 days after July 12, 2011 (as in fact occurred).

42.  In the same July 20, 2011 email correspondence Carlson asked Spitalnick: "I saw that today was also the deadline to file Daubert motions. Is today still the deadline? I assume that we did not file any sort of Daubert motion. Is that correct?"   Spitalnick replied: "Yes, Daubert motions were due today as well, however, we did not see any basis for filing one." PX 48. Prior to allowing the deadline to expire for filing Daubert motions, no attorney at HBS consulted with Monitronics as whether any Daubert motions should be filed.

43.  On July 22, 2011 Spitalnick emailed Turner, copying Fisher, Culp, Dyer, Carlson, Hudson and Hardina, a "Suit Approaching Trial Report (Due 45 Days Prior to Trial)". PX 47. In Part II, Spitalnick reported that "TelStar filed an answer but is otherwise unrepresented."

44.  On July 25, 2011 Culp emailed Fisher, copying Carlson and Spitalnick, asking why no notice of apportionment had been filed as to the victim's sister, Barbara Warren, or her son, Jeremy Veasley. PX 48.

a.   On July 27, 2011 HBS filed a third notice of apportionment naming Barbara Warren, her husband Frank Warren, and Jeremy Veasley.   No attorney at HBS disclosed to Monitronics that this notice of apportionment was subject to a motion to strike if the trial date was less than 120 days after July 20, 2011 (as in fact occurred).

**MII EXP RPT 0019**

45.  At no point on or after July 12, 2011 did any HBS attorney provide Monitronics any written information about the risks of continued representation by HBS due to its filing of notices of apportionment as to Okrah, the Warrens, and Jeremy Veasley so late as to risk being subject to a motion to strike as untimely.

46.  On July 15, 2011 Carol Dees, staff attorney to DeKalb Superior Court Judge Stacey K. Hydrick, notified Fisher that Judge Hydrick was ordering that discovery be re-opened through July 31, 2011 to allow Plaintiff to take the depositions of Monitronics' two experts, Colehower and Giacalone.   PX 54.

47.  On July 25, 2011 Fisher filed a Motion for Protective Order on behalf of Monitronics asking to postpone the depositions of Colehower and Giacalone that had been set for July 31, 2011. PX 55.   There are no written communications indicating that Fisher consulted with Monitronics regarding the subject matter of this motion before filing it.

48.   Fisher appeared on behalf of Monitronics at a hearing on July 27, 2011 at which Judge Hydrick denied the motion to postpone the experts' depositions.   PX 55. At this hearing:

a.  Judge Hydrick stated: "There has been a real lack of communication between you guys, and you are all going to have to start talking more and are going to have to start getting along better, frankly."

b.  Judge Hydrick then asked, "Do you all ever talk on the phone?"   Fisher immediately replied, "No."

c.   In response to the Judge's encouragement to resolve issues by talking on the phone, Fisher stated: "The Plaintiff's counsel in this case has been completely unreasonable … From the very beginning."

**MII EXP RPT 0020**

49.  At 11:57 am on July 31, 2011, attorney Dwayne Adams representing plaintiff attempted to begin the videotaped deposition of Giacalone.   Fisher was present in person at the deposition site; Adams and lead plaintiff's counsel Michael Neff participated by telephone. PX 58

a.  Before any questions were asked of the deponent, Fisher stated: "I will reserve objections except those going to the form of the question and responsiveness of the answer until the first use of the deposition, should it be used at a proceeding or otherwise."

b.  Adams responded: "We're requesting that all objections be stated in full, and I propose that we proceed that way."

c.  Neff[1] subsequently clarified, saying: "To the extent that you have an objection that could be cured at this time, it's our position you are required to assert it, and if you don't, you waive it."

d.  Fisher immediately responded: "Then I will conclude the deposition at this time."

50.  When Fisher announced that he was terminating the Giacalone deposition before it began, Neff said to him: "Do you want to call the Judge now?" PX 61.

a.  Fisher replied: "No, the deposition will not go forward."

b.  Neff: "You are absolutely refusing – if we call the Judge, you will not participate? Is that your response?"

c.  Fisher: "My position is this deposition is not going forward under those conditions. Those conditions are contrary to Georgia law, and I will not abide by them. This deposition is over. … I'm leaving. The deposition is over."

d.  Neff: "We're going to call the Judge. You're not going to be there?"

---

[1]  Although Neff prefaced his interjection in the deposition by saying, "At this point, we'll now speak on behalf of Plaintiff," PX 58, probably because both Adams and Neff were participating by telephone, the court reporter failed to recognize the change in speaker from Adams to Neff. See statement by Neff at Aug. 2, 2011 hearing, PX 61 at 18-19.

e.  Fisher: "You can call whoever you want. We're gone." …

f.  Neff: "And you refuse to see if we can get the Judge on the phone?

g.  Fisher: "I'm not interested in debating with you. … I think this is a dirty trick and we're leaving."

h.  Neff: "Fair enough. We will call the Judge. If we can get the Judge and you're not there when we call back, so be it."

i.  Fisher: "So be it."

Neff did immediately thereafter ascertain that Judge Hydrick was available at that time to address any issues coming up during the deposition. PX 58 at 18-24.

51.  On July 31, 2011 at 11:52pm Fisher sent a one paragraph email to Turner, copied to Culp, Carlson, Dyer, Hudson and Spitalnick, reporting that "I adjourned the deposition [of Giacalone] due to insistence of Plaintiff's counsel that (contrary to Ga. law) all objections must be at the time of deposition or be waived. … We are preparing a motion for sanctions which will be filed Monday." PX 56.

52.  On August 1, 2011 the plaintiff filed a Motion for Sanctions based in part on Fisher's termination of the Giacalone deposition, asking that Monitronics' answer be struck (which would result in a default judgment for Veasley) or in the alternative to strike Giacalone as an expert witness. PX 61

53.  On August 1, 2011 Fisher filed a Motion for Sanctions on behalf of Monitronics asking that all its costs associated with the aborted Giacalone deposition be paid by plaintiff.   PX 61. Although Fisher provided Monitronics with cursory notice late in the evening of July 31 that he would be filing a motion for sanctions, there was no meaningful consultation with

Page **17** of **31**

**MII EXP RPT 0022**

Monitronics about whether to file this motion before it was filed the next day, even though by

filing the motion Fisher required that his conduct on July 31 be the subject of a judicial ruling

and set up the situation described below where, purportedly on behalf of Monitronics, he, in

open court and on the record, repeatedly made misrepresentations and engaged in dishonesty

and deceit before Judge Hydrick on August 2, 2011.

54.  On August 2, 2011 Fisher wrote an extraordinary email to Turner and Culp, copied to Dyer,

Carlson, Hudson and Spitalnick, in which he explained in detail his real reasons for refusing to

allow the deposition of Giacalone to proceed on July 31, 2011 as ordered by Judge Hydrick.

PX 62. He stated:

a.  "I wanted to meet with the witness in person before the deposition."

b.  "I also wanted to have the benefit of Colehowers [sic] testimony [taken the morning of July

31] to help prepare Giacalone."

c.  "I noticed in the stack of exhibits Plaintiff provided the court reporter to use during the

deposition a dozen or so pages copied from blogs and web pages Giacalone had authored

which Plaintiff was going to use in the examination of Giacalone. I wanted him to have time to

read over this material in order for there to be no surprises, especially since the deposition was

on camera."

d.  "*Therefore*, I was able to utilize Plaintiffs [sic] unreasonable position on objections at

depositions *to stall the deposition in order to buy time for these things to occur*." (emphasis

added)

e.   "The judge [at the August 2 hearing] found fault with my refusal to wait for Plaintiff to

contact her by telephone to resolve the objection and dispute.   Of course, this would not have

served *my purpose of stalling the deposition*." (emphasis added)

f.   "We are going to have to pay some costs for this, but given the exposure, the importance of

the deposition and nature of the issue, I decided this would be *a relatively small price to pay*

for the opportunity to better hone the witness with Colehowers [sic] testimony and give the

witness and us an opportunity to review Giacalones [sic] several blogs and WebPages to come

up with reasoned responses and remove the element of surprise." (emphasis added)

55.  Plaintiff's Motion for Sanctions and Defendant's Motion for Sanctions were both brought on

for hearing by Judge Hydrick on August 2, 2011. PX 61.

56.  At the beginning of the hearing Fisher said to Judge Hydrick: "The big picture from the

beginning is Plaintiff's designed effort to create the appearance of all these discovery

problems, a reluctant Defendant, an obstructionist Defendant". PX 61, Tr. at 8. In making this

statement, Fisher engaged in deceit and misrepresentation; he was before the Court precisely

because of his strategic decision to obstruct the Giacalone deposition for reasons other than he

stated at the deposition or in the August 2 hearing, as he explained in PX 62.

57.  When Judge Hydrick stated to Fisher, "You were given an opportunity to stay and participate

in that call and you declined," he responded by making a false statement of material fact,

saying, "I did because I wanted to be able to present this Court with the proper case law". The

falsity of this statement is clear from PX 62 ("The judge found fault with my refusal to wait for

Plaintiff to contact her by telephone to resolve the objection and dispute. Of course, this would

not have served my purpose of stalling the deposition.")

58.  Fisher continued to engage in dishonesty, deceit and misrepresentation when Judge Hydrick

followed up, asking "And you couldn't have told me that very easily on the phone?" and he

responded "Well, I could have, but I didn't have any cases or cites."

59.  Judge Hydrick then (quite accurately) stated: "It looks like you have done everything that you

can to subterfuge this deposition and everything that you can possibly do to make sure this

deposition didn't go forward." Fisher responded with deliberate deceit: "That is absolutely

incorrect. We have no problem with the deposition going forward."

60.  Toward the end of the hearing Fisher said to Judge Hydrick: "I had absolutely no way of

knowing beforehand that Plaintiff's counsel was going to take the position that they were on

these objections. Had I known that could have been worked out beforehand.   So for them to

say that it was some kind of intentional calculated maneuver is absolutely – it cannot be

supported."   PX 61, Tr. at 53. This was a false statement of material fact. See Fisher

Deposition at 262 (Q. "Did you know before Giacalone's deposition began that the plaintiff

had that position on stipulation and objections [at the Colehower deposition defended by Joel

McKie earlier that day]? A. Yes.")

61.  At the August 2 hearing, Judge Hydrick repeatedly expressed her disapproval of Fisher's

conduct and the intent to impose significant monetary sanctions:

a.  "I still don't understand and, frankly, I probably never will understand why you simply

concluded the deposition, left the room without even bothering to have a conference call, case

law or no case law." Tr. at 17

b.  "With respect to the deposition on Friday, I do think that, Mr. Fisher, you violated the spirit of

what I was trying to accomplish at our hearing on the Motion for Protective Order and I am

going to order that that deposition be reconvened, and you're going to pay the cost of that

deposition, Mr. Fisher". Tr. at 41

c.  "I think the fact that you left this deposition and refused to participate in a conference call with the Judge, which could have alleviated this problem is the reason – is what I feel – I just feel like you did everything you could to try and make this deposition not happen,   Right or wrong, that's how the Court perceives this, and so I am going to order that the deposition be reconvened at your expense and I also am going to incur [sic] sanctions of the costs of the last deposition of this guy … and the costs for the Motion for Sanctions."   Tr. at 47-48.

d. "The Court is granting your [Plaintiff's] motion for sanctions against Mr. Fisher and is imposing costs; that he pay the costs for Mr. Giacalone's deposition the first time, the costs for you filing your motion for sanctions today, and the costs – all the costs for the deposition of Mr. Giacalone that's going to be in the courthouse here in the next 30 days.   … I will issue attorney fees for that [Defendant's] Motion for Protective Order because I do not think that was necessary. … I do think that the way the deposition was concluded by Mr. Fisher and him leaving the deposition without waiting for at least an opportunity to talk to the Court subverted the spirit and intention of what I was trying to accomplish last week in the hearing." Tr. at 51-52.

e. "Well, to me, the fact that you simply walked out of the building when he is giving you an opportunity to try and call the Court to resolve this issue, given that we had just had a hearing on this. I clearly wanted the deposition to go forward on Friday.   I had tried to come up with as many compromises as I could to make sure it happened, and then you left without giving me an opportunity to try to provide some assistance.   That's what the Court believes is the basis for the motion [sic] granting sanctions." Tr. at 53-54.

62. Judge Hydrick's perception at the August 2 hearing that Fisher was using obstructionist

**MII EXP RPT 0026**

strategies to delay the case going to trial caused her to set the case down for earliest available trial date:

Plaintiff's counsel: "I really do think that a trial date is what we need."

The Court: "Well, we're going to get that today. … [R]ight I'm going to put you guys as back-up on that November 7 calendar. … Nobody has a leave of absence filed for November 7, correct? … Okay. Nobody file one because I'll deny it." Tr. 39-40.

63.  A trial date of November 7, 2011 made the notices of apportionment for Okrah, the Warrens, and Jeremy Veasley all untimely.

64.  Incredibly, when Fisher emailed his report of the August 2 hearing to Turner, Culp, Dyer and Carlson, he stated: "It was a good day in court and I was quite pleased with the outcome of today's events." PX 62

a.  Although Judge Hydrick was quite specific about the extensive sanctions she was imposing, in this email Fisher only said vaguely "We are going to have to pay some costs."

65.  Although Fisher indicated that the case had been set for trial as the number two case on November 7, he failed to make the critical report that a trial date of November 7, 2011 would make the notices of apportionment for Okrah, the Warrens, and Jeremy Veasley all untimely.

66.  On August 2, 2011 Culp replied to Fisher's report of the August 2 hearing, asking: "Do we know the amount of the monetary sanctions? Will it consist of anything other than costs for the court reporter and videographer, i.e. will they also get attorney fees as part of the sanction?" PX 63. Fisher responded: "Unknown at this time."   This response was deceitful and a misrepresentation given that Judge Hydrick had repeatedly stated that she was awarding attorney fees, not only in relation to the deposition but also for bringing Plaintiff's Motion for

Sanctions and for opposing Fisher's "unnecessary" Motion for Protective Order.

67. Shortly after receiving Fisher's August 2, 2011 email, Monitronics terminated its representation by HBS.

68. At no point prior to the termination of HBS as its lawyers did Monitronics receive in writing any information about the materials risks to it of continued representation by HBS.

69. At no point prior to the termination of HBS as its lawyers did Monitronics consent to continued representation by HBS notwithstanding the significant risk of material and adverse effect to it of such representation.

70. Trial in Veasley v Monitronics commenced on November 7, 2011, and resulted in a verdict and a substantial damages award against Monitronics.

IV.  Opinion

   A. Malpractice

1. The elements of an action for legal malpractice against an attorney licensed to practice in Georgia are: (1) employment of the attorney by the plaintiff, (2) failure of the attorney to exercise ordinary care, skill and diligence, and (3) damages proximately caused by such breach. *Tante v Herring*, 264 Ga. 694, 453 S.E.2d 686, 687 (1994).

2. I have not been asked to provide an opinion as to whether any members of the HBS law firm breached any specialized standard of care for attorneys defending personal injury cases or representing insured defendants.

3. I have not been asked to provide an opinion as to damages caused by legal malpractice.

Page **23** of **31**

**MII EXP RPT 0028**

4. It is my expert opinion as of the date of this Report, based upon the documents listed in Part II and the assumptions set forth above in Section III, that James Fisher failed to exercise the ordinary care, skill and diligence required of attorneys licensed in Georgia for the reasons set forth below.

5. The violation of one of the Georgia Rules of Professional Conduct (GRPC) is evidence that the lawyer has failed to meet the duty of care required of a lawyer licensed in Georgia if that Rule is "intended to protect a person in the plaintiff's position or … addressed to the particular harm suffered by the plaintiff." *Allen v. Lefkoff, Duncan, Grimes & Dermer, P.C.*, 265 Ga. 374, 453 S.E.2d 719, 721-22 (1995).

6. At all relevant times, GRPC 1.7(a) has stated: "A lawyer shall not represent or continue to represent a client if there is a significant risk that the lawyer's own interests … will materially and adversely affect the representation of the client, except as permitted in (b)."

7. During all relevant times, and prior to November 3, 2011, GRPC 1.7(b) provided: "If client consent is permissible a lawyer may represent a client notwithstanding a significant risk of material and adverse effect if each affected client or former client consents, preferably in writing, to the representation after: (1) consultation with the lawyer; (2) having received in writing reasonable and adequate information about the material risks of the representation, and (3) having been given the opportunity to consult with independent counsel."

8. At all relevant times, and prior to November 3, 2011, GRPC 1.7(c) stated: "Client consent is not permissible if the representation … involves circumstances rendering it reasonably unlikely that the lawyer will be able to provide adequate representation to one or more of the affected clients."

**MII EXP RPT 0029**

9.   At all relevant times, GRPC 1.10(a) has stated: "While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rules 1.7: Conflict of Interest: General Rule, 1.8(c): Conflict of Interest: Prohibited Transactions, 1.9: Former Client or 2.2: Intermediary."

10.  At all relevant times, and prior to November 3, 2011, GRPC 1.2(a) stated: "A lawyer shall abide by a client's decisions concerning the objectives of representation … and shall consult with the client as to the means by which they are to be pursued."

11.  At all relevant times, and prior to November 3, 2011, GRPC 1.4 stated: "A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation, shall keep the client reasonably informed about the status of matters and shall promptly comply with reasonable requests for information."

12.  At all relevant times, and prior to November 3, 2011, GRPC 8.4(a) has stated: "It shall be a violation of the Georgia Rules of Professional Conduct for a lawyer to … engage in professional conduct involving dishonesty, fraud, deceit or misrepresentation".

13.  Fisher repeatedly violated GRPC 1.4 as follows:

a.  The legal basis and procedure for removing the Veasley case to federal court was not explained in a clear and consistent manner.

b.  Monitronics was not kept reasonably informed about the status of the case in regards to pursuing its rights to file notices apportioning fault to Stephen Okrah, Barbara Warren, Frank Warren, and Jeremy Veasley.

c.  Monitronics was not kept reasonably informed about the status of the case in regards to the filing of Daubert motions.

**MII EXP RPT 0030**

d. Fisher's August 2 email to Monitronics reporting on the August 2 hearing before Judge Hydrick failed to provide the explanation reasonably necessary to permit the client to make informed decisions regarding the representation and failed to keep the client reasonably informed about the status of the Veasley matter.

e. Fisher failed to comply promptly with his client's reasonable request for information when, on August 2, he gave the false response "Unknown at this time" to Culp's question: "Do we know the amount of the monetary sanctions? Will it consist of anything other than costs for the court reporter and videographer, i.e. will they also get attorney fees as part of the sanction?"

14. Fisher violated GRPC 1.2 by failing to consult with Monitronics about

a. whether to file a notice of removal within the first 30 days after receipt of the state court complaint;

b. whether to file Daubert motions prior to the expiration of the filing deadline.

15. I rely on the expert opinion of Stanley M. Karsman that the facts known to Fisher prior to the expiration of the first 30 days after service of the state court complaint indicated:

a. A compelling showing could be made that Tel-Star had been fraudulently joined to prevent diversity of citizenship and removal to federal court.

b. Monitronics could remove the case to federal court as a matter of right within 30 days of being served.

c. The standard of care applicable to Fisher required him to advise Monitronics that removal within 30 days on fraudulent joinder grounds was the best option for having federal court as the venue for the Veasley case.

**MII EXP RPT 0031**

16.  No later than June 3, 2010, when counsel for Tel-Star moved to withdraw without substitute counsel, Fisher was aware that he and other attorneys at HBS failed to exercise the standard of care applicable to them by failing to consult with Monitronics about the option of filing a notice of removal within 30 days of when the state court complaint was served on Monitronics.

17.  I rely on the expert opinion of Stanley M. Karsman that:

a.  Fisher had sufficient information and ample time to file notices of apportionment naming Stephen Okrah, Barbara Warren, Frank Warren and Jeremy Veasley.

b.  Fisher failed to comply with the requirement to file these notices 120 days before commencement of trial.

c.  The trial court denied these notices as filed out of time.

d.  The Court of Appeals upheld the trial court's ruling.

e.  Fisher's failure to timely file these notices of apportionment was a breach of the standard of care applicable to him.

18.  No later than July 12, 2011, when HBS filed the notice of apportionment naming Okrah while on notice that the pre-trial conference was set for August 2, 2011 and expecting a trial date in October 2011, Fisher was aware that he and other attorneys at HBS failed to exercise the standard of care applicable to them by failing to make sure that this notice of apportionment was filed more than 120 days before the trial date.

19.  No later than July 27, 2011, when HBS filed the notice of apportionment naming the Warrens and Jeremy Veasley while on notice that the pre-trial conference was set for August 2, 2011 and expecting a trial date in October 2011, Fisher was aware that he and

other attorneys at HBS failed to exercise the standard of care applicable to them by failing to make sure that this notice of apportionment was filed more than 120 days before the trial date.

20.  Fisher violated GRPC 8.4(a) and thus the standard of care applicable to him by knowingly making false statements of material fact to Judge Hydrick on August 2, 2011 and deliberately engaging in dishonesty, deceit and misrepresentation on multiple occasions during the August 2 hearing.

21.  Disclosure of malpractice by HBS attorneys would create potential harm to reputation as well as possible civil liability for HBS, and Fisher in particular, thus creating a substantial risk that the personal interests of Fisher and his duties to the firm would materially and adversely affect his representation of Monitronics.

22.  Pursuant to GRPC 1.7, "Conflict of Interests" and GRPC 1.10(a) all attorneys with the HBS firm were prohibited from engaging in continued representation of Monitronics at least as early as June 3, 2010 unless Monitronics provided consent to such representation in accordance with section (b) and (c) of Rule 1.7.   Continued representation of Monitronics without compliance with GRPC 1.7 became increasingly egregious on July 12, 2011, July 27, 2011 and August 2, 2011.

23.  GRPC 1.7(c)(3) states that client consent is not permissible if the representation involves "circumstances rendering it reasonably unlikely that the lawyer will be able to provide adequate representation" to the affected client.   It was reasonably unlikely that any lawyer at the HBS firm could provide adequate representation to Monitronics unless the company was first provided with a complete disclosure of the firm's prior. Only by providing such an

**MII EXP RPT 0033**

explanation – and thus incurring the full risk to HBS of such a disclosure – could the risk created by the conflicting interests to the individual lawyers and the firm be reduced to a level making even the possibility of client consent permissible.

24. Furthermore, even if client consent were permissible under GRPC 1.7(c)(3), Monitronics could only have provided the required informed consent after "having received in writing reasonable and adequate information about the material risks of the representation, and having been given the opportunity to consult with independent counsel," GRPC 1.7(b). Reasonable and adequate information of the risks of continued representation by HBS would have necessarily included a complete disclosure of the firm's prior malpractice by explaining thoroughly the inadequacies of the prior representation and advice.

25. At no time did Monitronics receive from HBS any writing that even purported to provide reasonable and adequate information about the risks of continued representation by HBS.

26. At no relevant time did Monitronics give consent pursuant to GRPC 1.7 to continued representation.

27.  Georgia Rules of Professional Conduct 1.2, 1.4, 1.7, 1.10 and 8.4 are "intended to protect a person" in position of Monitronics.

28. The Standards for Imposing Lawyer Sanctions which are followed by the Supreme Court of Georgia list among aggravating factors: dishonest or selfish motive, a pattern of misconduct, refusal to acknowledge the wrongful nature of conduct, and substantial experience in the practice of law.

29. Fisher's deliberate use of dishonesty, deceit and misrepresentation to prevent the deposition of Giacalone from taking place on July 31, and in his statements to the court on

August 2, 2011, would support at least a suspension from practice based on the Standards for Imposing Lawyer Sanctions.

B. Breach of Fiduciary Duty

1. A claim for breach of fiduciary duty requires proof of three elements: (1) the existence of a fiduciary duty, (2) breach of that duty, and (3) damages proximately caused by the breach *Nash v. Studdard*, 294 Ga.App. 845, 670 S.E.2d 508, 514 (2008).

2. "The relationship between a lawyer and client is a special one of trust that entitles the client to the attorney's fidelity. This 'unique' relationship is 'founded in principle upon the elements of trust and confidence on the part of the client and of undivided loyalty and devotion on the part of the attorney'."   *Aflac, Inc. v. Williams*, 264 Ga. 351, 444 S.E.2d 314, 316 (1994) (internal citations omitted).

3. Fisher breached his fiduciary duty of loyalty by continuing to represent Monitronics after committing malpractice against his client without disclosing that malpractice and obtaining the client's consent for further representation in compliance with GRPC 1.7.

4. Fisher breached his fiduciary duty of trust by deliberately using dishonesty, deceit and misrepresentation in an attempt to justify his own misconduct during the August 2, 2011 hearing before Judge Hydrick.

**MII EXP RPT 0035**

V.   Conclusion.

1. This report is not intended to encompass all negligent or deliberate acts or omissions by James Fisher or any other attorneys with the HBS law firm providing representation to Monitronics as described above that might fall below the standard duty of care that they owed to Monitronics as licensed attorneys in the State of Georgia.

2. I reserve the right to modify and supplement this Report after I have the opportunity to review any additional documents, testimony, or other factual information regarding this matter and any reports of other experts.

Dated: May 11, 2016

Clark D. Cunningham

MII EXP RPT 0036

# CLARK D. CUNNINGHAM

**Professor and W. Lee Burge Chair in Law & Ethics**
**Georgia State University College of Law**
P.O. Box 4037
Atlanta, GA 30302-4037
Phone: (404) 413-9168
Fax: (404) 413-9082
Office: Room 210
Administrative Assistant: Karen Butler (404) 413-9082  kpbutler@gsu.edu
Email: cdcunningham@gsu.edu
Home Page: www.ClarkCunningham.org
Street Address for Courier Delivery:
85 Park Place NE, 2nd Floor
Atlanta, GA 30303

**EDUCATION**:

WAYNE STATE UNIVERSITY LAW SCHOOL. Detroit, Michigan. J.D. 1981. Summa Cum Laude. Class Rank - 2nd. 3.91/4.0 GPA.

UNIVERSITY OF CHICAGO LAW SCHOOL. Chicago, Illinois. 1977-78. Floyd Mechem Scholarship. 79.6 GPA (top 5% of class). Invited to join Law Review. Joseph Beale award for excellence in first year research and writing program.

DARTMOUTH COLLEGE. Hanover, New Hampshire. A.B. 1975 Summa Cum Laude. Class rank - 3rd/796. Phi Beta Kappa. Senior Fellow. Concentrations in English and Anthropology. Perkins Literature Prize. Gurdin Drama Prize. Daniel Webster Scholar. National Merit Scholar.

**EMPLOYMENT:**

GEORGIA STATE UNIVERSITY COLLEGE OF LAW. Atlanta, Georgia. W. Lee Burge Chair of Law & Ethics. (6/02 - present). Courses: Fundamentals of Law Practice; The Client Relationship; Transition to Practice; Judicial Power; Professional Responsibility: Heroes & Villains; Criminal Justice Clinic; Criminal Justice Fieldwork & Law Reform; The Future of Legal Education: Comparative Perspectives.

WASHINGTON UNIVERSITY SCHOOL OF LAW. St. Louis, Missouri. Associate Professor (7/89-6/93); Professor (7/93-5/02). Israel Treiman Research Fellow (1999-2000). Courses: Comparative Constitutional Law; Law, Language & Culture; Remedies; The Legal Profession: Heroes and Villains ; Urban Community Dynamics; Law in the Urban Community; Urban Law Clinic I and II; Criminal Justice Clinic I and II; Pretrial Practice and Procedure; Law in Context; and seminar on Law as Language, Law as Literature.

1

1987-89 THE UNIVERSITY OF MICHIGAN LAW SCHOOL. Ann Arbor, Michigan. Clinical Assistant Professor of Law.

1986-1987 STARK AND GORDON. Detroit, Michigan. Associate in law firm specializing in employment discrimination and civil rights litigation.

1986 INDO-AMERICAN FELLOWSHIP PROGRAM. New Delhi, India. Three month fellowship as a visiting scholar at the Indian Law Institute doing comparative research on public interest litigation.

1983-1985 MICHIGAN LEGAL SERVICES. Detroit, Michigan. Staff attorney at the federally designated center for training, research and law reform for legal aid offices in Michigan. My major responsibilities were statewide training of legal aid attorneys, coordination of the Michigan Public Benefits Task Force, individual case consultation, and complex reform litigation.

1981-1983 THE HONORABLE AVERN COHN, U.S. DISTRICT JUDGE. Detroit, Michigan. Law Clerk.

**PUBLICATIONS:**

"Supreme Court of Georgia Dramatically Expands Student Practice: Supporting Experiential Education and Broadening Access to Justice," Georgia Bar Journal 50 (February 2016).

"Learning Professional Responsibility," Building on Best Practices: Transforming Legal Education in a Changing World (Deborah Maranville, Lisa Radtke Bliss, Carolyn Wilkes Kaas & Antoinette Sedillo Lopez eds. Lexis/Matthew Bender 2015); expanded version available at www.teachinglegalethics.org/learningpr .

"Finding a Better Way to Teach," 17 Chapman Law Review 173 (2013) (Annual Symposium Issue: The Future of Law, Business, and Legal Education: How to Prepare Students to Meet Corporate Needs) (transcribed remarks).

"What Do Clients Want From Their Lawyers?"**,** 2013 Journal of Dispute Resolution 143 (Annual Symposium Issue: Overcoming Barriers in Preparing Law Students for Real-World Practice), excerpted in Teaching the Clinic Seminar (Jane H. Aiken, Deborah Epstein & Wallace J. Mlyniec eds. West Academic 2014).

Law School of the Future: Centre of Cutting-Edge Practice?, The Law of the Future and the Future of Law: Volume II (Sam Muller, Stavros Zouridis, Morly Frishman & Laura Kistemaker eds. Torkel Opsahl Academic, The Hague) (2012).

"Should American Law Schools Continue to Graduate Lawyers Whom Clients Consider Worthless?", 70 Maryland Law Review 499 (2011).

**MII EXP RPT 0038**

"Developing Professional Judgment: Law School Innovations in Response to the Carnegie Foundation's Critique of American Legal Education," in The Ethics Project in Legal Education (Eds. Michael Robertson, Francesca Bartlett, Kieran Tranter & Lilian Corbin (London: Routledge-Cavendish 2010) (co-authored with Charlotte Alexander).

"Remediation Program for Dentists Provides Data on Moral Development Important to All Professions," 76 Journal of the American College of Dentists No. 4 (2009).

" 'How Can We Give Up Our Child?' A Practice-Based Approach to Teaching Legal Ethics," 42 The Law Teacher: The International Journal of Legal Education 312 (2008) (Special Issue on The Values of Common Law Legal Education).

"Valuing What Clients Think: Standardized Clients and the Assessment of Communicative Competence" (co-authored with Karen Barton, Gregory Todd Jones & Paul Maharg), 13 Clinical Law Review 1 - 65 (2006); reprinted in New Currents of Law School Education 131-146 (Kwansei Gakuin University Press 2009) (excerpted and translated into Japanese).

Book Review, The Worlds Cause Lawyers Make: Structure and Agency in Legal Practice, by Austin Sarat and Stuart A. Scheingold (eds), 16 Law & Politics Book Review 226 - 29 (2006).

"Legal Education After Law School: Lessons from Scotland & England," 33 Fordham Urban Law Journal 193 - 209 (2005) (special symposium issue on Professional Challenges in Large Firm Practice).

"The Professionalism Crisis: How Bar Examiners Can Make a Difference," 74 Bar Examiner 6 - 9 (Nov 2005) (lead article in special issue on "Other Lawyer Licensing Processes and Alternatives to the Bar Examination").

"Taking the Punishment out of the Process: From Substantive Criminal Justice Through Procedural Justice To Restorative Justice," 67 Law & Contemporary Problems 59 - 86 (Duke Law School Autumn 2004) (co-authored with Brenda Sims Blackwell).

"Rethinking the Licensing of New Attorneys: An Exploration of Alternatives to the Bar Exam," 20 Georgia State University Law Review vii-xxx (2004).

"After the Grutter Decision Things Get Interesting! The American Debate over Affirmative Action Is Finally Ready for Some Fresh Ideas from Abroad," 36 Connecticut Law Review 665 - 76 (2004)

"But What is Their *Story*?" 52 Emory Law Journal 1147-56 (2003).

"Lessons on Affirmative Action from India," 1 The Subcontinental: A Journal of South Asian American Political Identity 51-56 (Summer 2003) (Special Issue on Affirmative Action).

**MII EXP RPT 0039**

"Specialty Certification as an Incentive for Increased Professionalism: Lessons from Other Disciplines and Countries," 54 South Carolina Law Review 987- 1009 (2003) (co-authored with Adrian Evans).

"How to Explain Confidentiality?" 9 Clinical Law Review 579 -621 (2003).

"The World's Most Powerful Court: Finding the Roots of India's Public Interest Litigation Revolution in the Hussainara Khatoon Prisoners Case," in Liberty, Equality and Justice : Struggles for a New Social Order 83-96 (S.P Sathe ed.) (2003).

"Passing Strict Scrutiny: Using Social Science to Design Affirmative Action Programs," 90 Georgetown Law Journal 835-82 (2002) (with Glenn C. Loury & John David Skrentny).

"Affirmative Action: Comparative Policies and Controversies," International Encyclopedia of the Social and Behavioral Sciences 210 -214 (2002).

"Affirmative Action: India's Example," 4 Civil Rights Journal 22-27 (Fall 1999).

"Race, Class, Caste ...? Rethinking Affirmative Action," 97 Michigan Law Review 1296-1310 (1999) (with N.R. Madhava Menon) (published with a reply by Cass Sunstein).

"Evaluating Effective Lawyer-Client Communication: an International Project Moving From Research to Reform," 67 Fordham Law Review 1959-86 (1999).

"Hearing Voices: Why the Academy Needs Clinical Scholarship," 76 Washington University Law Quarterly 85-95 (1998), reprinted in Legal Education for the 21st Century (Donald B. King ed.1999).

"Rethinking Equality in the Global Society," 75 Washington University Law Quarterly 1561-1676 (1997) (transcribed conference proceedings) (edited entire transcript; authored opening and closing plenary speeches, id. at 1579, 1672).

"Taking It to the Streets: Putting Discourse Analysis to the Service of a Public Defender's Office," 2 Clinical Law Review 285-314 (1995) (with Bonnie S. McElhinny).

"Using Common Sense: A Linguistic Perspective on Judicial Interpretations of 'Use a Firearm'," 73 Washington University Law Quarterly. 1159-1214 (1995) (with Charles J. Fillmore).

"What is Meaning in a Legal Text?" 73 Washington University Law Quarterly 800-970 (1995) (transcribed proceedings: Northwestern University-Washington University Law and Linguistics Conference).

**MII EXP RPT 0040**

"Bringing Linguistics into Judicial Decisionmaking," 2 Forensic Linguistics: The International Journal of Speech, Language, and the Law 81-98 (1995) (with Jeffrey P. Kaplan, Georgia M. Green, and Judith N. Levi).

"Learning from Law Students: A Socratic Approach to Law and Literature?" 63 University of Cincinnati Law Review 195-220 (1994) (Symposium on Law, Literature and the Humanities).

"Plain Meaning and Hard Cases," 103 Yale Law Journal 1561-1625 (1994) (with Judith N. Levi, Georgia M. Green, and Jeffrey P. Kaplan) (cited 114 S.Ct. 1259, 1264; 114 S.Ct. 1793, 1806; 114 S.Ct. 2251, 2255).

"Sometimes You Can't Make a Dent, But They Know You've Been There: The Lawyer As God's Witness," 106 Harvard Law Review 1962-79 (1993).

"The Lawyer as Translator, Representation as Text: Towards an Ethnography of Legal Discourse," 77 Cornell Law Review 1298-1387 (1992).

"Why American Lawyers Should Go to India: Retracing Galanter's Intellectual Odyssey," 16 Law & Social Inquiry (Research Journal of the American Bar Foundation) 777-808 (1991).

"A Tale of Two Clients: Thinking About Law as Language," 87 Michigan Law Review 2459-2494 (1989) (reprinted in Alex Hurder et al (eds.), Clinical Anthology (1997).

"A Linguistic Analysis of the Meanings of 'Search' in the Fourth Amendment: A Search for Common Sense," 73 Iowa Law Review 541-609 (l988).

"Professional Responsibility," 34 Wayne Law Review 1005-1031 (l988).

"Public Interest Litigation in the Supreme Court of India: A Study in Light of the American Experience," 29 Journal of the Indian Law Institute 494-523 (1987).

Legal Ethics in a Gandhian Perspective. (First Gandhi Memorial Lecture: Gandhi-In-Action International) New Delhi, India. l987. Reprinted in R. P. Misra, The Gandhian Model of Development and World Peace (1989).

**SCHOLARLY AND PROFESSIONAL PRESENTATIONS**:

"Implementation of the New Student Practice Rule," presented January 16, 2016, Georgia Supreme Court - Georgia Board of Bar Examiners Meeting, St. Simons Island, Georgia.

Organized Fall 2015 Meeting of the National Institute for Teaching Ethics & Professionalism, Atlanta, Georgia.

**MII EXP RPT 0041**

Organized 2015 Burge Conference on Law & Ethics, "Lawyers as Leaders," November 9, 2015, Georgia State University College of Law, Atlanta, Georgia.

"Courage, Compassion and Commitment: Two Ethical Decisions that Changed History," The 2015 Judge Harry J. Wilters, Jr.  Lecture on Constitutional Law and Professional Ethics, University of South Alabama, September 2015.

"Public Interest Litigation in India," presented at 8th Worldwide Conference of the Global Alliance for Justice Education, Turkey, July 2015.

"Learning Professional Responsibility for the Practice of Law: the Way Forward," presented at 8th Worldwide Conference of the Global Alliance for Justice Education, Turkey, July 2015.

Deans' Forum on Professional Formation, March 1-2, 2015, Pepperdine University School of Law, Malibu, California (invited discussant).

"Proposed New Student Practice Rule," presented January 17, 2015, Georgia Supreme Court - Georgia Board of Bar Examiners Meeting, St. Simons Island, Georgia.

"Lessons from Gandhi on Professional Responsibility," presented January 13, 2015, Workshop on Consumer Protection and Public Interest Advocacy, National Law School of India University, Mangalore, India.

"Kapila Hingorani: India's First Public Interest Lawyer," presented January 11, 2015, First Kapila Hingorani Memorial Lecture, Nehru Memorial Museum and Library, New Delhi, India.

"Courage: Operationalizing Research on Virtue Ethics and Moral Development for Professional Education," presented January 7, 2015, Varieties of Virtue Ethics Conference, Oriel College, University of Oxford, UK.

Organized and Chaired Fall 2014 Meeting of the National Institute for Teaching Ethics & Professionalism, Serenbe, Georgia.

Organized and Chaired 2014 International Workshop of the National Institute for Teaching Ethics & Professionalism, City Law School, London, UK.

"Are We Making a Difference? Assessing the Effectiveness of Legal Ethics Education," July 11, 2014, Sixth International Legal Ethics Conference, London, UK (organized and chaired panel).

"Vison 2016: Legal Education," June 27, 2014, Annual Meeting of the Florida Bar, Orlando, Florida (invited discussant).

**MII EXP RPT 0042**

"Access to Justice, Legal Education & Incubators," March 3, 2014, Bleckley Inn of Court, Atlanta, Georgia (co-presented with Hulett Askew).

Organized and Chaired Fall 2013 Workshop of The National Institute for Teaching Ethics & Professionalism, Serenbe, Georgia.

Workshop on Moral Courage, Opening Speaker, Teach Legal Ethics UK, The City Law School, London, England, July 12, 2013.

Convivium on Education, Professionalism and the Academy, invited participant, supported by a grant from the United Kingdom Higher Education Academy, Papa Westray, Scotland, July 1-5, 2013.

Lead Presenter, National Conference on Transforming Legal Education, Nigerian Law School, Nigeria, May 5 -10, 2013.

"Conflicts of Interest Survival for Corporate Counsel: Advance Waiver – To Waive or Not to Waive," presented March 14, 2013, Annual Corporate Counsel Conference, Hispanic National Bar Association, Atlanta, Georgia.

"Conflicts, Confidentiality and Representing a Corporate Entity," presented February 21, 2013, Kilpatrick Townsend & Stockton LLP Annual Ethics Conference, Atlanta, Georgia.

"Finding a Better Way to Teach," presented February 1, 2013, Chapman Law Review Symposium: The Future of Law, Business, and Legal Education: How to Prepare Students to Meet Corporate Needs, Orange, California.

"What Do Clients Want From Their Lawyers?"**,** presented October 19, 2012, at Law Review Symposium on Overcoming Barriers in Preparing Law Students for Real-World Practice, University of Missouri School of Law, Columbia, Missouri.

"Does Legal Education Need to Give Higher Priority to Teaching Ethics and Professional Judgment? If So, What Can Be the Role for Professional Bodies and Regulatory Bodies?", organized and co-chaired session on October 5, 2012 at the Annual Conference of the International Bar Association, co-sposored by the Academic & Professional Development Committee, Professional Ethics Committee, and Bar Issues Commission, Dublin, Ireland.

"Where Will the New Law Jobs Be?", organized session on October 4, 2012 at the Annual Conference of the International Bar Association, co-sposored by the Academic & Professional Development Committee, Young Lawyers Committee, and Senior Lawyers Committee, Dublin, Ireland.

"Open-access resource designed for teaching ethics and professionalism," co-presented with Professor Nigel Duncan on July 14, 2012, at the Fifth International Legal Ethics Conference, Banff, Alberta, Canada.

**MII EXP RPT 0043**

Organized and Chaired 2012 International Workshop of The National Institute for Teaching Ethics & Professionalism, Banff, Alberta, Canada.

Organized and Chaired Spring 2012 Workshop of The National Institute for Teaching Ethics & Professionalism, Seattle, Washington.

"Anti-Money Laundering, Ethics and Professional Judgment: A Teaching Exercise," presented March 9, 2012, Annual Meeting of the American College of Trust & Estate Counsel (ACTEC), Miami.

"Real-Life Experience and Authentic Responsibility," Keynote Address, February 13, 2012, National Conference on Curriculum Renewal in Legal Education, Queensland University of Technology, Brisbane, Australia.

"A Case That Changed History - Gandhi as Commercial Litigator," presented February 9, 2012, New Foundations for Legal Process and Lawyers' Ethics: Australia New Zealand Legal Ethics Colloquium, University of Otago, Dunedin, New Zealand.

Organized and Chaired 2011 Burge Conference on Law & Ethics, Georgia State University College of Law, Atlanta.

Organized and Chaired Fall 2011 Workshop of The National Institute for Teaching Ethics & Professionalism, Serenbe, Georgia.

"Anti-Money Laundering, Ethics and Professional Judgment: A Teaching Exercise," presented November 2, 2011, Annual Conference of the International Bar Association, Dubai (Joint Session of the Academic & Professional Development Committee and the Anti-Money Laundering Legislation Implementation Working Group).

"Anti-Money Laundering, Ethics and Professional Judgment: A Teaching Exercise," presented October 29, 2011, Teaching Ethics in the Law Curriculum, The City Law, City University London. Also served as co-organizer of the workshop.

"The OPM Teaching Exercise," presented October 20, 2011, Canadian Association for Legal Ethics, University of New Brunswick Faculty of Law.

"Conflicts, Confidentiality and Representing a Corporate Entity," presented June 1, 2011, Sidley & Austin, New York City.

"Client Satisfaction and Effective Representation through Listening: How Hard Can It Be?," presented June 1, 2011, Sidley & Austin, New York City.

"The Emerging Worldwide Emphasis on Teaching Ethics and Professionalism," presented April 29, 2011 at the opening session of the Spring 2011 Workshop of The

MII EXP RPT 0044

National Institute for Teaching Ethics & Professionalism held at St. Thomas University School of Law, Minneapolis. Also organized and chaired the entire workshop.

"When and How Legal Ethics Should be Taught," presented January 29, 2011 at the Fourth Learning in Law Annual Conference, sponsored by the United Kingdom Centre for Legal Education and held at the Warwick University School of Law (co-presented with Nigel Duncan and Tony King).

"Conflicts, Confidentiality and Company Law," presented January 26, 2011 to Dundas & Wilson, Edinburgh (Scotland's largest law firm).

Conference on Empirical Professional Ethics, held at St. Thomas University School of Law, on November 6, 2010, in Minneapolis, Minneapolis (invited discussant).

"Are We Making a Difference? Developing Outcome Measures to Evaluate the Effectiveness of Law School Efforts to Teach Ethics and Develop Professionalism," presented on October 16, 2010 at FutureEd 2: Making Global Lawyers for the 21st Century, Harvard Law School.

"Educating the Digital Lawyer," Berkman Center for Internet & Society, Harvard University, October 14, 2010 (invited discussant).

"Ethical Competence: Preparing Lawyers for Substantial Client Responsibility," organized and chaired three hour joint session of the Academic & Professional Development Committee and the Professional Ethics Committee on October 7, 2010, at the Annual Conference of the International Bar Association, held in Vancouver, Canada.

"When Ethical Rules Differ," participated in panel presentation to the Professional Ethics Committee on October 4, 2010 at the Annual Conference of the International Bar Association, held in Vancouver, Canada.

"Ideas for Teaching Ethics and Professionalism," plenary speaker at the Annual Meeting of the Continuing Legal Education Regulators' Association, on July 26, 2010, in New York City.

"Global Collaboration Toward More Effective Teaching of Legal Ethics and Professionalism," panel presentation on July 16, 2010 at the Fourth International Legal Ethics Conference held at Stanford Law School.

"Fostering An Ethical Professional Identity," participated in plenary panel presentation on June 25, 2010, at the annual American Bar Association Conference of Associate Deans, held in Minneapolis, Minnesota.

"Threshold Learning Outcome on Ethics and Professional Responsibility," presented by pre-recorded video on June 7, 2010, for the Inaugural Conference of Associate Law Deans in Melbourne, Australia.

MII EXP RPT 0045

"Can We Predict and Prevent Professional Misconduct? Lessons from the Dental and Medical Professions," organized and chaired panel presentation on June 5, 2010, at the American Bar Association Annual National Conference on Professional Responsibility, held in Seattle, Washington.

"Developing Criteria for Effective Client Communication from Standardized Client Assessment Protocols," presented May 6, 2010, in Baltimore, Maryland at the 2010 Clinical Conference of the Association of American Law Schools.

"Learning How to be a Lawyer in America: Before or After the Law Degree?", presented April 28, 2010, at the University of Maryland Law School, Symposium on The Profession and the Academy: How Are They Addressing Major Changes in Law Practice?

"How the New Hampshire Program Has Adapted a Required Element of Medical Licensing By Creating "Standardized Client" Assessments," presented on April 23, 2010, at the Conference on A Performance-Based Approach to Licensing Lawyers: The New Hampshire Two-Year Bar Examination, University of New Hampshire School of Law.

"Deciding to Let the Windmill Win: the Baby Jessica Adoption Case," presented in Madrid, Spain, on October 7, 2009, at a Joint Session of the Academic and Professional Committee and the Judges Forum on *Tilting at Windmills*, Annual Meeting of the International Bar Association.

"What Clients Want from Their Lawyers: Are Big Firm Clients Different?," presented in Denver on May 28, 2009, as part of a panel on *Private Practice Lawyers: Economic & Organizational Structure of Law Firms* at the Annual Meeting of the Law & Society Association.

"Creating an International Web-Based Resource for Teaching Legal Ethics," presented January 23, 2009 at the Third Learning in Law Annual Conference, sponsored by the United Kingdom Centre for Legal Education and held at the Warwick University School of Law.

"The Justice Education Initiative," organized and chaired half-day workshop on December 7, 2008, Fifth Worldwide Conference of the Global Alliance for Justice Education held at the Ateneo de Manila University Law School, the Philippines.

"Innovative Methods for Teaching Legal Ethics," presented July 28, 2008 at a Special Program for Mexican Law Teachers, Annual Conference of the Southeastern Association of Law Schools.

**MII EXP RPT 0046**

"The Justice Education Initiative of the Global Alliance for Justice Education," presented June 19, 2008 at the Annual Conference of the Consortium for Computer Assisted Legal Instruction (CALI), hosted by the University of Maryland School of Law.

"Lessons from Gandhi on Becoming a Lawyer," presented in India on October 2, 2007 at the Regional Workshop on Clinical Teaching Methods at the National Law Institute in Bhopal; on October 6 at the Regional Workshop on Clinical Teaching Methods at the Symbiosis Law College in Pune; and on October 9 at the Government Law College, Sikkim.

"Effective Lawyer-Client Communication" and "Clinical Methods for Teaching Ethics and Professionalism," presented in India in May and October 2007 at three regional workshops on clinical teaching methods (in Bangalore, Bhopal and Pune) sponsored by the South Asia Forum of Clinical Law Teachers.

"Learning from the Mistakes of American Legal Education," Opening Keynote Address at the 2007 International Legal Education and Legal Profession Forum in Beijing, China, on August 8. The conference was sponsored by the Committee of Chinese Clinical Legal Educators and supported by the Ford Foundation.

" 'Smart Without Purpose': The Carnegie Foundation Critique of American Legal Education," presented at four Australian law schools -- Flinders, Monash, Macquarie and Griffith -- during March and April 2007. An expanded version was presented at a special faculty meeting of the University of New Mexico School of Law in September 2007.

"Using the Internet to Promote Justice Education," organized and chaired session on December 8, 2006 at the Fourth Worldwide Conference of the Global Alliance for Justice Education, held at the National University of Argentina. Also presented "Innovative Approaches to Teaching Legal Ethics" on December 7.

"The World's Most Powerful Court: Finding the Roots of India's Public Interest Litigation Revolution in the Hussainara Khatoon Prisoners Case," presented November 19, 2006 in London, England at an international conference on Comparative Constitutional Traditions in South Asia, co-sponsored by Johns Hopkins University and the University of London.

"What Clients Want from Their Lawyers," Keynote Speaker, Annual Partners Meeting of Dundas & Wilson, Scotland's largest law firm, in Edinburgh, Scotland, on November 11, 2006.

"Professionalism and the Accredited Specialist" (co-presenter with Robert Pirrie, Chief Executive, The Society of Writers to Her Majesty's Signet, Edinburgh, Scotland), Annual Roundtable of the ABA Standing Committee on Specialization, San Antonio, March 24, 2006.

**MII EXP RPT 0047**

"Do We Value What Clients Think About Their Lawyers? If So, Why Don't We Measure It?" Presented October 28, 2005 at the 6th International Clinic Conference at Lake Arrowhead, California, co-sponsored by UCLA Law School and the Institute of Advanced Legal Studies, University of London (co-authors: Karen Barton, Gregory Todd Jones & Paul Maharg).

"Clinical Education Changing the World and the World Changing Clinical Education: the Global Alliance for Justice Education," Keynote Address at the International Conference on Clinical Legal Education, held at Monash University, Melbourne, Australia. July 14, 2005.

Conference on the Training Framework Review, Nottingham Law School, England. June 22-23, 2005. Invited discussant.

 "Legal Education After Law School: Lessons from England & Scotland," presented at the Conference on Professional Challenges in Large Firm Practice held at Fordham Law School, April 15, 2005.

"Do We Value What Clients Think About Their Lawyers? If So, Why Don't We Measure It?" 7th Annual Conference of the Learning in Law Initiative, United Kingdom Centre for Legal Education, University of Warwick, England, January 7, 2005 (co-presented with Professor Paul Maharg, Glasgow Graduate School of Law).

"Taking the Punishment out of the Process," Marilyn Stein Bellet Conference on Ethics and the Law, Fordham School of Law and Low Country Legal Aid, Hilton Head, S. Carolina, November 12, 2004.

"The U.S. Patriot Act and the War on Terror," The Dartmouth Lawyers Association, Hanover, New Hampshire, September 11, 2004.

Third International Conference of the Global Alliance for Justice Education, Krakow, Poland, July 2004 (opening speaker).

"Confidentiality and Clients," ABA National Conference on Professional Responsibility, Naples, Florida, June 4, 2004.

"40th Anniversary Panel, Is the Process Still the Punishment 25 Years Later?" Annual Meeting of the Law & Society Association, Chicago, May 28, 2004.

"Using Specialty Certification to Promote Professionalism," Annual Roundtable of the ABA Standing Committee on Specialization, New Orleans, March 26, 2004 (Keynote Speaker).

"After the Grutter Decision Things Get Interesting! The American Debate over Affirmative Action Is Finally Ready For Some Fresh Ideas from Abroad," Affirmative

MII EXP RPT 0048

Action: An International Perspective on a Global Dilemma, Annual Law Review Symposium, University of Connecticut, November 6, 2003 (Opening Speaker).

2003 Symposium on Advanced Issues in Dispute Resolution, Hamline University School of Law, November 2-3, 2003 (discussant).

"Re-Examining the Bar Exam: A Workshop to Explore Alternative Licensing Proposals," Society of American Law Teachers, University of Minnesota Law School, October 11, 2003 (discussant).

"What is Their Story?", 2003 Conference on Ethics and Professionalism, Emory Law School.

"From Ideology to Facts: Shifting Legal Discourse about Affirmative Action in U.S. Higher Education," International Conference on Discrimination, Diversity and Public Policy, Washington University in St. Louis, March 29 - 30, 2003.

"Taking the Punishment out of the Process," 4th Annual Public Law Conference, Duke Law School, December 13-14, 2002.

"Conference on Problems in Discovery and Professionalism," University of Georgia Law School, November 14 -15, 2002 (invited discussant).

"The Effective Lawyer-Client Communication Project," Hispanic National Bar Association, Annual Meeting, Atlanta, October 17, 2002.

"National Conference on Professionalism," Stanford Law School & University of South Carolina School of Law, Charleston, South Carolina, September 27-29, 2002 (invited participant).

"Taking the Punishment out of the Process," American Council of Chief Defenders, Austin, Texas, September 18, 2002.

"Conference on Restorative Justice," New College Law School, San Francisco, August 30 -September 2, 2002 (invited participant).

"Impact of Alabama v Shelton in Georgia," Chief Justice's Commission on Indigent Defense, Atlanta, July 26, 2002.

"The Reach of Law in India," Annual Meeting of the Law & Society Association, Vancouver, May 29 - June 2, 2002 ( chaired panel discussion).

Second Worldwide Conference of the Global Alliance for Justice Education, University of Natal, Durban, South Africa, December 2001 (facilitator for pre-conference workshop and post-conference training program on teaching legal ethics).

**MII EXP RPT 0049**

"How to Explain Confidentiality," Fifth International Clinical Conference, UCLA Law School, November 2001 (also chaired session on international clinical education).

"Passing Strict Scrutiny: Using Social Science to Design Affirmative Action Program," Fall 2001 Research Workshop Series, Institute on Race and Social Division, Boston University, November 2001 .

"Law and Narrative as Ways of Creating and Remembering Vast Meaning," Law as Literature Conference, University of Frankfurt, Germany, October 2001.

"Adarand Constructors v Mineta," Annual Supreme Court Preview, William & Mary Law School, September 2001.

"The Client's Perspective on the Initial Interview: A Social Science Approach," Hart Legal Workshop, Institute of Advanced Legal Studies, University of London, June 2001 (also chaired session entitled, "The Attorney-Client Relationship: An Increasingly Important Topic for Legal Education, Research and Law Reform").

"Why the U.S. Supreme Court Should Cite the Supreme Court of India in Its Next Affirmative Action Case," Law and Society in Contemporary India Conference, Harvard University, May 2001.

"Why a Future Lawyer Should Study Literature," Dartmouth College, February 2001 (campus-wide lecture co-sponsored by the English Department and the Daniel Webster Legal Society).

Supervision Skills Workshop, Vermont Law School, February 2001 (co-sponsored by the Clinical Legal Education Association, provided training to clinical law teachers from around the United States on lawyer-client communication).

"Assessing Quality Legal Services: The Client's Perspective," Clinical Legal Education Association, New York City, July 2000 (organized and chaired workshop held in conjunction with annual meeting of the American Bar Association).

" 'What is Their *Story*?' Using Steven Spielberg's **Amistad** to Improve Lawyer-Client Communication," 2000 Conference on Law, Culture & the Humanities, Georgetown University Law Center, March 2000.

"Linguists in the Supreme Court and the Jail Cell," The Dartmouth Lawyers Association Speakers Series: Law and the Liberal Arts, Dartmouth College, January 1999.

"Race, Class, Caste... Rethinking Affirmative Action," Department of Government, Dartmouth College, January 1999.

"Evaluating Effective Lawyer-Client Communication: an International Project Moving From Research to Reform," Worldwide Advocacy Conference, Inns of Court School of

**MII EXP RPT 0050**

Law, London, England (July 1998) (plenary address); also presented at The Conference on The Delivery of Legal Services to Low-Income Persons: Professional and Ethical Issues sponsored by the American Bar Association, Open Society Institute, and The Legal Services Corporation (Fordham Law School, New York City December 1998), the Annual Meeting of the International Client Counseling Competition Board (March 1999), the Midwest Clinical Teachers Association (October 1999), Inaugural Conference of the Global Alliance for Justice Education (December 1999), New York University Law School (September 2000).

International Seminar of Legal Clinics, Buenos Aires, Argentina, December 1997. Inaugural meeting of faculty and students from seven South American law schools (Argentina, Chile and Peru), funded by the Ford Foundation, to discuss promotion of public interest law through law school clinics. I was one of several North American commentators.

"Rethinking Equality in the Global Society," Washington University, St. Louis, November 1997. (Co-organized this 3-day conference with Marc Galanter and N.R. Madhava Menon and delivered the opening and closing plenary addresses. The conference included over 30 leading legal scholars and social scientists from the United States, South Africa, and India.

"A Modest Proposal: Cross-National Empirical Research on Lawyer-Client Communications." Presented at the Annual Meeting of the Law & Society Association (June 1997); the Fourth International Conference on Clinical Legal Education and Scholarship sponsored by UCLA and the University of London (October 1997); University of South Pacific Department of Law (March 1998); Bond University School of Law, Griffith University School of Law, Queensland University of Technology Law Faculty; Centre for Legal Education, Australia (March 1998).

"50 Years of Indian Independence," Bangalore, India, May 1997. (Five day workshop on constitutional law, celebrating the 50th anniversary of the Indian Constitution. I was part of a workshop faculty that included two former Indian Supreme Court Justices, the Solicitor General of India, a former Attorney General of India, a former President of the Bar Council of India, and the Dean of the National Law School of India.)

"Empirical Studies of Attorney-Client Communications," Faculty Seminar, University of Sydney Law School, Australia, September 5, 1996.

"Innovations in Clinical Education: The International Law Reform Competition," Clinical Education Conference, Association of American Law Schools, Miami, May 20, 1996.

"Using Linguistics to Interpret Laws: the Problem of Disciplinary Boundaries," presentation to the Law and Social Science Group, Northwestern University, May 9, 1996.

15

"Arguing and Deciding Hard Cases with the Help of Linguistics: Some Recent Supreme Court Cases," presentation to the American Bar Foundation, May 8, 1996.

"An Auspicious Time: Public Interest Litigation and Legal Education," presentation to the International Institute of Public Interest Law in New Delhi, India, December 7, 1995.

"Northwestern University-Washington University Law and Linguistics Conference," co-chaired three day conference in Evanston, Illinois, bringing together 13 leading American linguists and law professors on the topic, "What is Meaning in a Legal Text?" (March 31-April 2, 1995), and organized subsequent symposium issue on law and linguistics: 73 Washington University Law Quarterly, 769-1313 (1995).

"Taking It to the Streets: Putting Discourse Analysis to the Service of a Public Defender's Office," presented to the New York Clinical Theory Workshop, March 17, 1995.

"Empirical Studies of the Legal Profession," Association of American Law Schools Annual Meeting (1994) (Joint Session of Section on Professional Responsibility and Section on Clinical Legal Education) (co-chaired session with Marc Galanter)

"Linguistic Analysis of Supreme Court Cases" and "Social Science and the Law School Clinic," Annual Meeting of the Law & Society Association (1994) (co-chaired both roundtable sessions)

"Public Interest Litigation in the Supreme Court of India: The Problem of Remedy," National Law School of India (1994) (also scheduled for presentation to the International Institute of Public Interest Law on 1/27/94 immediately after the inaugural address by the Chief Justice of India)

"Plain Meaning and Hard Cases," Institute for Legal Studies, University of Wisconsin (1993)

"A Plea for Empiricism in the Study of American Law," Annual Meeting of the Law & Society Association (1993)

"The Client's Voice: Using Narrative in Traditional and Clinical Teaching," Association of American Law Schools Annual Meeting (1993) (Joint Session of Committee on Curriculum and Research and Section on Clinical Legal Education).

"Social Science and the Law School Clinic," Annual Meeting of the Law & Society Association (1992) (organized and chaired roundtable program).

"The Lawyer-Client Relationship: Individual Dynamics," Hastings Law School Conference on the Theoretics of Practice (1992) (discussant).

**MII EXP RPT 0052**

"Crossing the Waters: Transcending International and Interdisciplinary Barriers in the Study of Law and Religion," University of Iowa Conference on Religion and Law in Independent India (1991).

"A New Way of Practicing Law: The Lawyer as Translator." Various versions presented to: the Second International UCLA-Warwick Clinical Conference (1989); the Law & Society Program, Macalaster College (1990); the Institute for Legal Studies, University of Wisconsin-Madison (1990); the Annual Meeting of the Law & Society Association (1990); Annual Cornell Law Review Symposium (1992).

"The Ethnography of Legal Discourse," Annual Mid-West Clinic Conference (1990). "Whether to See the Wizard: The Choice Between Federal and State Forum," Federal Litigation Conference: Legal Services Committee on Regional Training (1990) (opening address).

"Developing Scholarship out of Clinical Education," Mid-West Clinic Conference (1989).

"Teaching and Practicing Law as if Words Matter: Epistemology, Semantics, Metaphor and Legal Reasoning," Symposium on Legal Narrative (University of Michigan Law School 1989).

"In Search of Common Sense, A Linguistic Approach to Fourth Amendment Law," Association of American Law Schools Annual Meeting (1988).

**PROFESSIONAL AWARDS**:

2013 JAMES SHEEHAN LIFETIME ACHIEVEMENT AWARD, United Community Housing Coalition, Detroit, Michigan. (In recognition of "your founding efforts to establish the United Community Housing Coalition and the Cass Corridor Neighborhood Development Corporation, your work as a civil rights litigator, and as clinical director at the University of Michigan and Washington University, and your current work as the W. Lee Burge Professor of Law & Ethics at Georgia State University of Law.")

2012 Annual Meeting of the International Bar Association, Award for "achievement of goals of noteworthy significance" on behalf of the Academic and Professional Development Committee. ("In recognition of the exceptional on-going web based initiative for the teaching of ethics.")

ASSOCIATION OF AMERICAN LAW SCHOOLS SCHOLARLY PAPER. Winner of 1988 Competition.

FULBRIGHT SCHOLAR: INDIA. Selected for a Senior Scholar Award to be a visiting professor at the National Law School of India for the 1993-94 academic year. Award declined.

**SIGNIFICANT LITIGATION:**

**MII EXP RPT 0053**

Kareem Allen v. State (Supreme Court of Georgia) (2010) (amicus brief).

Alan Cohen as Trustee of Friedman's Creditor Trust v. Morgan Schiff & Co., 385 B.R. 381,. 446-62 (S.D. Ga. 2008) (opinion and order denying defendants' motion to dismiss, citing Cunningham expert witness affidavit for plaintiff on malpractice claim against debtor's former law firm). Law firm settled malpractice claim shortly after this decision, 394 B.R. 623, 634 (S.D. Ga. 4/16/08). *See also* In Re Friedman's Inc. Derivative Litigation, 386 F.Supp 1355, 385 F.Supp 1345 (N.D. Ga 2005) (related case).

McKesson Information Solutions LLC v. Duane Morris LLP (Fulton County Superior Court, Georgia) (Order of Disqualification November 8, 2006) (as independent expert, testified that purported waiver of future conflicts in engagement letter was inconsistent with Georgia Rules of Professional Conduct).

Snapping Shoals Elec. Membership Corp. v. RLI Ins. Corp., 2006 WestLaw 1877078 (N.D.Ga. 2006)(order disqualifying major national law firm for conflict of interest) (served as expert witness in support of motion to disqualify)

ETS Creditors' Litigation Trust v. Charles Edwards et al (N.D. Ga.) (expert witness for plaintiff, appointed by bankruptcy court to represent victims of one of the largest investor scams of the decade, the ETS Payphone scheme; retained to evaluate the ethical conduct of law firm that represented the ETS corporation and its sole stockholder).

East Main Baptist Church v. Union Planters Bank,142 S.W.3d 729 (Mo. 2004) (expert witness for defendants in opposition to motion to certify class on grounds that class counsel created non-consentable conflict of interest by accepting payment of fees from potential defendant) (Missouri Supreme Court ruled for defendants, denying class certification, consistent with my expert opinion).

State of Georgia v. Michael Abernathy, 630 S.E.2d 421 (Ga. App. 2006) (expert witness on conflict of interest in support of motion for new trial) (denial of new trial motion affirmed on appeal).

Adarand Constructors v Mineta, 122 S. Ct. 511 (2001) (filed amicus brief in Supreme Court on behalf of Social Science and Comparative Law Scholars).

Monsanto Company v. Eugene Stratemeyer, S.D. Ill., Case No. 99-4197-GPM (expert witness in support of motion to disqualify; motion granted)

United States v. X-Citement Video, 115 S.Ct. 464 (1994) (filed amicus brief on behalf of the Law & Linguistics Consortium providing the Court with a linguistic analysis of the disputed provision of the federal child pornography act)

Lindsay v. Jones, Parton v. White (E.D. Mo. 1993) (effected major reform of prison health care in Missouri through two consolidated class actions).

**MII EXP RPT 0054**

Wade v. City of Festus Housing Authority (E.D. Mo. 1992) (successful class action challenge to lack of due process in public housing eviction procedures).

Rahman v. Matador Villa Associates, 821 S.W.2d 102 (Mo. 1991) (on behalf of four amicus law professors, successfully urged the Missouri Supreme Court to review and reverse a decision barring tenants from pursuing personal injury claims if not raised as counterclaims in summary eviction proceedings.)

Will v. Mich. Dept. of State Police, 491 U.S. 58 (1989). Co-counsel on certiorari petition and brief for petitioner Will. Issue: whether a state or a state official can be sued in state court for federal constitutional violations under 42 U.S.C. §l983.

Falls v. Sporting News Co., 834 F.2d 6ll (6th Cir. l987). Counsel for appellant. Case of first impression regarding scope of the employment discrimination provisions of the Michigan Civil Rights Act.

In re Contempt of Dougherty, 429 Mich. 8l, 4l3 N.W.2d 392 (l987). Counsel for Michigan bishops of the Episcopal, Methodist and Roman Catholic churches appearing as amici curiae. Issue raised by amici was the First Amendment right to refuse to promise future compliance with an injunction to refrain from anti-nuclear civil disobedience when such a promise would violate deeply held religious beliefs.

Tyrna v. Adamo Inc., l59 Mich. App. 592, 407 N.W.2d 47 (l987). Counsel for appellant. Case of first impression regarding right to sue under the Michigan Whistleblowers' Protection Act for retaliation arising out of the reporting of occupational health violations.

Detroit Base Coalition for Human Rights of the Handicapped v. Mich. Dept. of Social Services, 431 Mich 172, 428 N.W.2d (1988). Landmark decision interpreting the Michigan Administrative Procedures Act, applying it to policies used by the Michigan Department of Social Services in welfare cases and specifically invalidating policy of denying in-person hearings because not promulgated as a rule under the APA. I served as co-counsel at the trial level.

Kelley v. Salem Mortgage Co., 34 Bankr. Rep. 902 (E.D. Mich. l983), 4l Bankr. Rep. 420 (E.D. Mich. l984), 783 F.2d 626 (6th Cir. l986). Lead counsel for a consortium of legal services attorneys opposing a proposed federal class action settlement affecting over 2500 low-income homeowners victimized by illegal mortgage lending practices. After extended litigation over both the merits and issues of bankruptcy jurisdiction, on a second appeal to the Sixth Circuit in l988 a new settlement was negotiated, substantially increasing benefits to the homeowner class members.

Ayres v. Dempsey (E.D. Mich). Co-counsel in statewide federal class action challenging Michigan policy of denying welfare benefits to children receiving mental health care.

**MII EXP RPT 0055**

Michigan Welfare Rights Organization v. Dempsey (E.D. Mich). As lead counsel representing a coalition of welfare rights organizations, negotiated federal consent judgment resulting in major reforms to Michigan welfare application procedures.


**OTHER EXPERIENCE:**

Manuscript reviewer for Cambridge University Press, University of Chicago Press, and The International Journal of Speech, Language and the Law.

Director, National Institute for Teaching Ethics & Professionalism (NIFTEP) (2005 - present). NIFTEP is a consortium of nationally-recognized program on ethics and professionalism: The Experiential Advantage at the Sturm College of Law, University of Denver; The Louis Stein Center for Law & Ethics at Fordham University; The Center on the Global Legal Profession at the Maurer School of Law at Indiana University-Bloomington; The Mercer University School of Law Center for Legal Ethics and Professionalism; The Holloran Center for Ethical Leadership in the Professions at the University of St. Thomas School of Law; and The W. Lee Burge Endowment for Law & Ethics at Georgia State University. NIFTEP's national workshops are also sponsored by the American Bar Association Standing Committee on Professionalism. See the NIFTEP web site: www.niftep.org

Member, Board of Directors and Executive Committee, Lawyers for Equal Justice, Inc. (Georgia State University representative to non-profit corporation supported by the State Bar of Georgia and all five Georgia law schools to provide post-graduate training and support to recent law school graduates committed to serving low and moderate income persons)(2015 – present).

International Bar Association, Academic & Professional Development Committee, Vice-Chair (2011-14), Advisory Board (2015-present).

Member, The Chief Justice's Commission on Professionalism, Supreme Court of Georgia (Georgia State University representative) (August 2002 - present).

Reporter, Student Practice Rule Committee, Board of Bar Examiners, State of Georgia (2014-15).

Special Master, Supreme Court of Georgia (2010-14) (conduct lawyer discipline hearings and make findings of fact and conclusions of law to be reviewed by Supreme Court of Georgia). Report and recommendation of disbarment adopted by the Supreme Court, In re Dicks, 758 S.E.2d 311 (Ga. 2014).

Georgia State University College of Law. Chair, Awards Committee (2013-present); Chair, Lectures & Speakers Committee (2003 - 2008); Strategic Planning Committee, member (2013-14); Curriculum Committee, member (2008 - 2009); Legal Education Study Group, member (2007 - 2008); Dean's Advisory Committee, member (2005 -

**MII EXP RPT 0056**

2008); organized the major conference held to celebrate the College of Law's 25th anniversary in 2008; co-chaired annual law review symposium (2004).

International Member of the Reference Group advising on a multiyear project for the design, implementation and evaluation of a good practice approach to the final year experience in Australian legal education being funded by the Australian Learning and Teaching Council (2009 - 2012).

International member of the Expert Advisory Group for the Learning and Teaching Standards Project-Law of the Australian Learning & Teaching Council (ALTC) charged with drafting threshold learning outcomes for legal education in Australia (2010).

Member, Teaching Innovation Committee, the *Legal Education Analysis and Reform Network* (LEARN). LEARN was supported by a consortium of 10 law schools, including Harvard, Stanford, Georgetown, New York University and Vanderbilt. Its co-convenors were Associate Dean Lawrence Marshall, Stanford Law School, and Dr. William M. Sullivan, Co-Director of the Carnegie Foundation's Preparation for the Professions Program. For more information see LEARN's Description of Planned Projects for 2009 - 2010. (2007 - 2009).

Academic Consultant to the Society of Writers to Her Majesty's Signet in the development of a new specialty accreditation program for lawyers in Scotland. The Society, one of the oldest professional bodies in the world, is an independent membership organization for lawyers based in Edinburgh (2005-2009).

Chair, Selection Committee, National Award for Innovation & Excellence in Teaching Professionalism, American Bar Association/Conference of Chief Justices (2003 - 2006). See the Award web site: http://clarkcunningham.org/Professionalism/Award-Home.htm

The Effective Lawyer-Client Communication (ELCC) Project. Director. Pilot project to develop a model methodology for evaluating initial client interviews.

Global Alliance for Justice Education (GAJE). Steering Committee, 1997-99; 2007 - 2009. Convenor, 2007 - 2009. Chair, Communication Committee (2006 - 2007); Chair, Constitution Committee, 1999- 2001. Organized and co-chaired the 1996 Working Group Meeting in Sydney, Australia which developed this international organization to promote socially relevant legal education. See web site: www.gaje.org

Fulton County Criminal Justice Blue Ribbon Commission. Member (January 2005 - October 2006).

Co-Reporter, The Chief Justice's Commission on Indigent Defense, Supreme Court of Georgia (Final Report Issued September 1, 2004).

1999 International Client Counseling Competition, Chicago, Illinois. Served as a judge for international law student competition sponsored by the International Bar Association.

**MII EXP RPT 0057**

1999 Special City Counselor, Law Department, City of St. Louis. Appointed to represent the City of St. Louis on major cases involving the city's innovative ordinances to stabilize neighborhoods by proceeding against property used for drug sales and other crimes under a public nuisance theory.

1998 - 2001 Urban Families and Community Development Program, Washington University Supervisory Council for inter-disciplinary graduate program bringing together faculty from social work, public health, public policy, education, law and architecture to provide innovative approaches to empowering low-income urban communities.

1996-98 Enforcing Human Rights through Law School Clinics, Project Director. Ford Foundation project to develop law school clinics in India designed to enforce human rights, with emphasis on women's rights and criminal justice.

1996 Parsons Visiting Scholar, University of Sydney School of Law, Australia.

1995 South Asia Course on Clinical Legal Education, National Law School of India. (Was one of eight members of an international faculty of a 3 week course for law professors from India, Nepal and Bangladesh to expand use of clinical teaching methods in South Asia legal education).

1994 Consultant on Clinical Education, National Law School of India.

1990 Sichuan University. Chengdu, Sichuan, Peoples Republic of China. Visiting Professor of Law (faculty exchange program with Washington University).

Washington University Program on Social Thought and Analysis, Law School Representative to Executive Committee (1990- 2002). Chair, Study Sites Committee (1994-98). Senior Search Committee for first STA Professor (1993-94).

Washington University School of Law. Chair, Committee on Foreign Study (1999 - 2002); Chair, International Programs Committee (1998-99); Chair, Faculty-Student Relations Committee (1996-97); Chair, Computer Committee (1995-96); member, Personnel Committee (1992-94), Curriculum Committee (1990-92, 2000-01); Marketing Committee (1998-99). Institute for Global Legal Studies (1999 - 2002). Center for Interdisciplinary Studies (1999 - 2002).

Association of American Law Schools. Member of 1989 Scholarly Paper Competition Selection Committee. Member of Committee on the In-House Clinic. Member of Committee on Clinical Scholarship. Member of Planning Committee for 1996 Clinical Conference emphasizing international and interdisciplinary perspectives.

1987 University of Michigan Law School. Ann Arbor, Michigan. Visiting Adjunct Lecturer in Law. Taught "Lawyers and Clients."

**MII EXP RPT 0058**

1987-89 Michigan Attorney Discipline Board. Hearing Panel Member.

1987-89 Michigan Housing Trust Fund. Secretary, Board of Trustees. I was a founding member of MHTF, an innovative charitable foundation which financed housing construction and rehabilitation for persons at or below poverty level.

1985-1988 Wayne State University Law School. Detroit, Michigan. Adjunct Professor. Taught Professional Responsibility and Federal Civil Rights Litigation.

1982-89 Cass Corridor Neighborhood Development Corporation. Chairperson and Chief Executive Officer (1982-87), Secretary (1987-88), Board of Directors. CCNDC is a community-based, non-profit corporation which rehabilitates apartment buildings for low income tenants using a combination of federal and private funds.

1980-1985 Detroit Community Services Commission. Elected representative to this federally mandated Community Action Board for the Detroit Neighborhood Services Department.

1979-1987 Concerned Citizens of Cass Corridor. Board of Trustees. 4Cs was a non-profit community organization which advocated for low-income residents of an inner city neighborhood and works with the City of Detroit in the expenditure of federal community development funds.

1975-77, 1978-80 United Community Housing Coalition. Detroit, Michigan. UCHC is a non-profit, community based corporation devoted to improving inner city housing conditions. I was originally assigned to UCHC as a federal VISTA volunteer in 1975, at which time UCHC had no paid staff. I wrote successful grant proposal, recruited board of directors, and incorporated UCHC. In 1977 I served as the first executive director, hiring and directing full-time staff of seven. I left to attend law school and then returned in 1978 as special projects director, a position I retained while completing law school.

**MII EXP RPT 0059**

PriorCases(2May2016)

Attachment 2

| Name | Number | Court | Type | Dates | Affidavit | Report | Deposed | Testified in Court | Attorney Who Retained | Address |
|------|--------|-------|------|-------|-----------|--------|---------|--------------------|----------------------|---------|
| Ishtiaq Khan v Holland ^ Knight | 11-CV-207344 | Fulton Superior, GA | Malpractice, Breach of Fiduciary Duty, Fraud | 2013-14 | No | No | Yes | No | Julia Glasgow | Mills Paskert Divers, 1355 Peachtreee NE, Atlanta, GA 30309 |
| Andrea Engelman v Randall Kessler et al | 13-CV-10963-7 | DeKalb Superior | Breach of Fiduciary Duty | 2013-present | No | Yes | Yes | No | Tamela Adkins | 234 Luckie Street, Lawrenceville, GA  30046 |
| Bennett Kight v. Suzanne Wilner | 2013CV227097 | Fulton Superior, GA | Malpractice | 2012 - 2015 | Yes | No | No | Yes | F. Edwin Hallman | Hallman & Wingate, LLC, 166 Anderson Street, S.E. Suite 210, Marietta, Georgia 30060 |
| BBC Partners v Old Republic National Title (Womble, Carlyle) | CV 10-A-09956-9 | Gwinett Superior | Malpractice | 2012-2013 | No | No | Yes | No | Paul Andrew | Seven Lumpkin St, Lawrenceville GA  30046 |
| Kaminsky v Sutherland Asbill & Brennan | 2011-CV-200854 | Fulton Superior, GA | Malpractice, Breach of Fiduciary Duty, Fraud | 2012-2013 | Yes | Yes | Yes | No | Roger Barton | 420 Lexington Avenue, 18th floor, New York, NY 10170 |
| Sabadia v. Holland & Knight | BC 438701 | Los Angeles | Malpractice, Breach of Fiduciary Duty, Fraud | 2011-12 | Yes | Yes | Yes | Yes | David Ribakoff | 233 Wilshire Blvd, Santa Monica  90401 |

**MII EXP RPT 0060**

| From: | James H. Fisher |
|---|---|
| To: | "Jeff Turner" |
| Cc: | "Ben Dyer"; Denise W. Spitalnick |
| Subject: | RE: Veasley v. Monitronics, et al |
| Date: | Monday, November 02, 2009 10:34:53 AM |

Jeff,

   Responding to your voice mail message, TelStar was previously represented by an attorney who was hired personally by TelStar and who withdrew because he had difficulty getting paid.  We are going to inquire further of TelStar owner as to why this was not reported to his carrier if he had one.
Regarding effect of default on removal, TelStar is a Georgia corporation and therefore a resident of Ga. Plaintiff is a resident of Ga. The presence of a Ga. corp. as co-defendant prevents complete diversity and is a bar to our removal to federal court.  Our plan has been to remove the case to federal court once complete diversity is created by the dismissal of TelStar on summary judgment ( eliminating the Ga. resident defendant and thereby creating diversity needed for removal).  If default is entered against TelStar, it will not be dismissed and diversity needed for removal will not exist.
I will let you know once we learn more about insurance for TelStar.
Best regards,
 Jim.


**JIM FISHER**
**HALL BOOTH SMITH & SLOVER, P.C.**
1180 West Peachtree Street, NW, Suite 900
Atlanta, GA  30309
Direct dial: 404-954-6953  Fax: 678-539-1502
E-mail:jfisher@hbss.net
Website:  www.hbss.net

        -----Original Message-----
        **From:** James H. Fisher
        **Sent:** Friday, October 30, 2009 12:00 PM
        **To:** 'Jeff Turner'; 'Ben Dyer'; 'Peggy Carlson'; Steve Hedrick
        **Cc:** Denise W. Spitalnick
        **Subject:** Veasley v. Monitronics, et al

        Jeff,
          Codefendant, TelStar owner has indicated that he is filing an answer today without attorney
        representation.  In Georgia, a corporation can not appear pro se and Plaintiff can after 15 days
        move to strike the answer and enter default judgment against TelStar. The significance of this
        development is that this will adversely affect removal of the case to federal court which would be
        possible if TelStar were dismissed on summary judgment.  TelStar is no longer in business and
        former owner has no income or other resources.  He stated that he wants to contact Monitronics
        for defense.  Ia m not aware of whether or not there is any indemnity flowing from Monitronics to
        TelStar under the sales agreement or whether there would be coverage in any event.  Best
        regards, Jim.

        **JIM FISHER**
        **HALL BOOTH SMITH & SLOVER, P.C.**
        1180 West Peachtree Street, NW, Suite 900
        Atlanta, GA  30309
        Direct dial: 404-954-6953  Fax: 678-539-1502
        E-mail:jfisher@hbss.net
        Website:  www.hbss.net

Attachment 3

MII EXP RPT 0061

| | |
|---|---|
| **From:** | Denise W. Spitalnick |
| **To:** | "HARDINJ2@scottsdaleins.com" |
| **Cc:** | James H. Fisher |
| **Subject:** | RE: Velma Veasley vs. Monitronics International, Inc., D/A: 03/26/2006, Our Excess Claim #: 1123559-10, First Mercury Primary Underlying Claim #: 14855 |
| **Date:** | Monday, January 04, 2010 3:59:14 PM |
| **Attachments:** | VEASLEY - Response to Plaintiff s First Interrogatories to Monitronics 11-05-2009.DOC |
| | VEASLEY - Response to Plaintiff s First RPD to Monitronics 11-05-2009.DOC |
| | VEASLEY - Response to Plaintiff s First Request for Admissions.DOC |

Scott,

We have not taken plaintiff's deposition yet, and are in the process of scheduling same.  We hope to have it completed by the end of this month or beginning of February.  Upon completion I will provide you with a summary.  We are filing our responses to plaintiff's first admissions, interrogatories, and requests for production of documents, which I have attached for your review, today.  Counsel for Tel-Star has indicated that he is going to be filing a motion for summary judgment based on the fact that it was not involved in the monitoring of plaintiff's residence when the subject incident occurred.  If Tel-Star's motion is granted we can remove the case to federal court (because complete diversity would then exist), and can file our MSJ at that time.  A federal court judge would be preferable.  However, if Tel-Star's MSJ is not granted we will still file our motion for summary judgment in state court.  I will keep you updated on all new developments.

Best regards,
Denise


Denise W. Spitalnick

Hall Booth Smith & Slover, P.C.

1180 West Peachtree Street, NW, Suite 900

Atlanta, GA 30309

Direct dial: 404-954-6955; Fax: 404-954-5020

E-mail: dspitalnick@hbss.net

Website:  www.hbss.net



-----Original Message-----
From: HARDINJ2@scottsdaleins.com [mailto:HARDINJ2@scottsdaleins.com]
Sent: Monday, January 04, 2010 3:14 PM
To: Denise W. Spitalnick
Subject: Re: Velma Veasley vs. Monitronics International, Inc., D/A: 03/26/2006, Our Excess Claim #: 1123559-10, First Mercury Primary Underlying Claim #: 14855


Denise:

Please see your last E-mail of 10/16/2009 and bring us up to date with regards to any subsequent activity. Plaintiff's deposition was to be scheduled to shore up our Motion for Summary Judgment. Please advise as to whether or not that deposition has yet taken place, or whether it has been scheduled. If completed, please provide a summary, and

Attachment 4

**MII EXP RPT 0062**

include an updated opinion with regards to the chances of that Motion for Summary Judgment being sustained, along with any additional thoughts or recommendations you may have. Thanks!

Jim Hardina, Sr. Claims Specialist
Scottsdale Insurance Company
P.O. Box 4120
Scottsdale, Az. 85261
Telephone (800)423-7675 Ext. 2661
FAX (480)443-5218

MII EXP RPT 0063