**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| **MONITRONICS INTERNATIONAL, INC.,** | |
| **Plaintiff,** | |
| **v.** | **1:15-cv-3927-WSD** |
| **HALL, BOOTH, SMITH, P.C. and JAMES H. FISHER, II** | |
| **Defendants.** | |

## <u>OPINION AND ORDER</u>

This matter is before the Court on a discovery dispute between Defendants

Hall, Booth, Smith, P.C. ("Hall Booth") and James H. Fisher, II ("Fisher")

(collectively, "Defendants"), Plaintiff Monitronics International, Inc.

("Monitronics"), and nonparties Culp & Dyer LLP ("Culp & Dyer"), Carlock

Copeland & Stair LLP ("Carlock Copeland"), Holland & Knight LLP ("Holland &

Knight"), First Mercury Insurance Company ("First Mercury"), and Nationwide

Mutual Insurance Company f/k/a Scottsdale Insurance Company ("Scottsdale").[1]

---

[1]     The Court refers to Culp & Dyer, Carlock Copeland, Holland & Knight,
First Mercury, and Scottsdale, collectively, as "Nonparties."  The Court refers to
Culp & Dyer, Carlock Copeland, and Holland & Knight, collectively, as "Nonparty

# I.    BACKGROUND

## A.    Introduction

This is a legal malpractice case.  Monitronics claims that Defendants were professionally negligent in their representation of Monitronics in a state court lawsuit brought against it by Velma Veasley ("Veasley").  Plaintiff Monitronics provides security alarm monitoring services in Georgia and other states.  (Am. Compl. ¶ 1).  Defendant Hall Booth is an Atlanta law firm.  (Am. Compl. ¶ 5). Defendant Fisher is a partner at Hall Booth.  (Am. Compl. ¶ 6).  Defendants represented Monitronics in the Veasley litigation but were terminated by Monitronics and its Insurers three months before trial.  Culp & Dyer assisted Monitronics in the Veasley litigation by overseeing aspects of the litigation. Carlock Copeland replaced Monitronics as trial counsel.  Holland & Knight represented Monitronics on appeal from the trial court's judgment.  First Mercury was Monitronics' primary insurer for the damages awarded in the Veasley litigation.  Scottsdale provided excess liability insurance for Monitronics.

Defendants request Monitronics and Nonparties to produce documents about the Veasley litigation created after Defendants were removed as Monitronics'

_____

Law Firms."  The Court refers to First Mercury and Scottsdale, collectively, as "Insurers."

counsel.  Monitronics and Nonparties object to the document requests on the grounds that the documents are protected by the attorney-client, work product and common interest privileges.  Defendants claim that Monitronics waived its attorney-client privilege by suing Defendants for malpractice and that any claimed work product materials are necessary for Defendants' defense and that they are required to be produced.

B.    The Veasley Incident[2]

On October 23, 1998, Veasley contracted with Tel-Star Alarms, Inc. ("Tel-Star") to install a security system and provide alarm monitoring services for the Veasley home.  (Am. Compl. ¶ 9).  Veasley gave Tel-Star her work phone number, including her extension, as her alarm contact information, and designated her sister, Barbara Warren ("Warren"), as her emergency contact.  After the security system was installed, Tel-Star assigned its alarm monitoring duties to Monitronics.

At 4 a.m. on March 29, 2006, Veasley went to work.  At 10:27 a.m., her security system alarm was triggered by a motion sensor installed as part of the security system.  A Monitronics representative called Veasley's home.  When

---

[2]    Unless otherwise indicated, the facts in this section are taken from the Georgia Court of Appeals' opinion in Monitronics Int'l, Inc. v. Veasley, 746 S.E.2d 793 (Ga. Ct. App. 2013).

3

Veasley failed to answer, the representative dispatched the police.  A few minutes later, the representative called Veasley's work number.  The representative terminated the call when an automated message directed the representative to dial an extension or press 1 to speak with an operator.  The representative then called Veasley's sister, Warren, but did not reach her.

At 10:41 a.m., another internal motion sensor triggered the alarm.  Two minutes later, a system alert indicated that the door to the home's attached garage had been opened.  At 11:27 a.m., an internal motion sensor triggered the alarm for a third time.  Approximately five minutes later, the system reported that the garage door was opened again.  The Monitronics representative called Veasley's work number after these alarms, but again ended the call when directed to the automated message system.  The representative called Warren for a second time but was not able to reach her.

At 11:46 a.m., an internal motion sensor was triggered for a fourth time. The police were called by the Monitronics representative.  About thirty minutes later, the representative successfully contacted Warren and asked her to meet the police at Veasley's home.  ([98.11] at 14).  Warren, who had a key to Veasley's house, stated that she would be there within twenty minutes.  ([98.11] at 14). When Warren arrived, the police were not there.  ([98.11] at 14).  Warren left a

handwritten note near the entrance to Veasley's garage.  Warren did not attempt to contact Veasley, and did not notify Monitronics that she had not connected with the police.  ([98.11] at 14).

At 1:06 p.m., after Warren left Veasley's home, there was a fifth trigger of a motion sensor.  ([98.11] at 14).  The Monitronics representative again called Veasley's work number but did not reach her.[3]  The representative then called Warren's home and spoke to Warren's husband, who explained that Warren had not returned from Veasley's house.  Warren's husband did not attempt to contact Veasley.  ([98.11] at 14).  A short time later, the police told a Monitronics representative that they would not respond to further dispatches unless someone met them with a key to Veasley's home.  No further alarms were triggered throughout the afternoon, and Monitronics made no further attempts to contact Veasley, Warren, or the police.

At 7:25 p.m., Veasley returned home from work.  She parked in her garage, got out of her car, and opened an internal door to her house, causing the alarm to sound.  As she went inside and turned off the alarm, a Monitronics representative called her home telephone.  Veasley told the representative she was fine but did not understand why the alarm had triggered.  The representative said the alarm likely

---

[3]     Veasley had, by this time, gone to her second job.

sounded because the door she entered did not have a delay timer. The representative did not tell Veasley about the earlier alarms and Veasley did not see Warren's note about the alarms.

Veasley then saw a tequila bottle and a cell phone in her bedroom that she did not recognize. She also noticed her bed had been disturbed. She called her sister and left a voicemail, mentioning the alarm and asking her to return her call. After showering and eating, Veasley went to her bathroom to get ready for bed when she was grabbed by Stephen Okrah ("Okrah"), who was brandishing a knife. Okrah forced Veasley into her car, threatened her life, and drove her to several ATMs to withdraw money from Veasley's bank account. He drove back to Veasley's house, forced Veasley into her bedroom, and raped her.

After Okrah fell asleep, or passed out, in Veasley's bed, Veasley ran to her neighbors' house and called the police. The police arrived and arrested Okrah. Okrah pleaded guilty to numerous offenses, including rape.

C.     The Veasley Litigation

On March 28, 2008, Veasley filed a federal civil action, asserting claims for negligence and intentional infliction of emotional distress against Tel-Star, Monitronics, and the DeKalb County Police Department. (Am. Compl. ¶ 11); see Complaint, Veasley v. Tel-Star Alarms, Inc. et al., 1:08-cv-1251-GET (N.D. Ga.

6

Mar. 28, 2008), ECF No. 1.  Defendants represented Monitronics in the lawsuit and, on April 15, 2009, the court dismissed the case for lack of subject matter jurisdiction.  (Am. Compl. ¶ 12).  On August 18, 2009, Veasley filed suit in DeKalb County State Court, asserting claims against Monitronics and Tel-Star for negligence, breach of contract, and fraudulent misrepresentation.  (Am. Compl. ¶ 13).[4]  Defendants represented Monitronics until early August 2012, when they were terminated and replaced by Carlock Copeland.

Carlock Copeland represented Monitronics at trial three months later.  The trial jury found that Monitronics "did not exercise ordinary care, increased the danger to Veasley, and failed to comply with industry standards."  Monitronics Int'l, Inc. v. Veasley, 746 S.E.2d 793, 799 (Ga. Ct. App. 2013).  The jury awarded Veasley $8.64 million in damages, apportioning 96% of the fault to Monitronics and 4% to Veasley.  Id. at 799.  The state court denied Monitronics' post-trial motions, and the Georgia Court of Appeals affirmed the trial court's judgment.  On November 4, 2013, the Supreme Court of Georgica denied Monitronics' petition for a writ of certiorari.  ([79.1] at 3).  Monitronics was represented on appeal by Holland & Knight.

---

[4]     The claims for breach of contract and fraudulent misrepresentation later were dismissed.  (Am. Compl. ¶ 13).

After the appeals were concluded, Veasley was paid approximately $9.723 million.  ([98.11] at 29).  First Mercury contributed $1.456 million, Scottsdale contributed $5.627 million, and Monitronics contributed $2.640 million to the payment amount.  ([98.11] at 29).

D.   <u>Monitronics' Alleged Professional Negligence</u>

On November 11, 2015, Monitronics filed its Complaint [1], asserting claims against Defendants for legal malpractice, punitive damages, attorneys' fees, and litigation expenses.[5]  Monitronics alleges that Defendants were professionally negligent in their representation of Monitronics in the Veasley lawsuit. Monitronics alleges further that "Defendants' negligence and professional malpractice was the proximate cause of economic damage to Plaintiff of $9,722,957.40," the verdict amount due after appeal.  (Am. Compl. ¶ 51). Defendants assert several defenses, including comparative negligence, lack of causation, and failure to mitigate damages.  ([55]).  Defendants also have filed a notice seeking to apportion fault to Carlock Copeland.  ([88]).

---

[5]   On April 28, 2016, Monitronics filed its First Amended Complaint [49] to cure jurisdictional pleading deficiencies in its initial complaint.

8

Monitronics asserts a variety of allegations to support its malpractice claim.

      1.    <u>Failure to Remove to Federal Court</u>

Monitronics claims Defendants were negligent in failing to remove the *Veasley* lawsuit to federal court. Monitronics alleges that DeKalb County is "arguably the most plaintiff-friendly venue in the state," that the *Veasley* complaint did not allege a cognizable clam against Tel-Star and that Tel-Star was improperly joined to prevent diversity, that Monitronics repeatedly asked Defendants to remove the case, and that Fisher repeatedly stated he would do so. (Am. Compl. ¶¶ 14-16). Monitronics alleges that Defendants' strategy was to "wait[] and depend[] upon defunct and mostly unrepresented Tel-Star to file and have granted a motion to dismiss it from <u>Veasley</u> before expiration of the one-year deadline for removal." (Am. Compl. ¶ 17). This alleged "implausible strategy" failed, Monitronics claims, because Tel-star was not dismissed before the removal deadline and the case was not removed. (Am. Compl. ¶ 17).

      2.    <u>Failure to Depose Key Witnesses and Adequately Depose Veasley</u>

Monitronics alleges that Defendants negligently failed to interview or depose Okrah. Following Defendants' termination, Okrah revealed to Carlock Copeland that he had been living with Veasley and paying rent. (Am. Compl. ¶ 24). "Email exchanges reveal that these facts were known to Defendants, and

9

they simply failed to develop them." (Am. Compl. ¶ 24).[6] Monitronics claims that Okrah's testimony would have shown Okrah was permitted to be in Veasley's house. (Am. Compl. ¶ 24). Carlock Copeland did not call Okrah as a witness at trial, suggesting that Defendants' failure to develop these facts may not have impacted the jury's verdict or that Carlock Copeland exercised its strategic prerogative not to call Okrah. ([98.2] at 7).

Monitronics alleges further that Defendants failed to interview or depose Veasley's son, despite knowing about inadmissible evidence linking him to the assault. (Am. Compl. ¶ 25). Veasley's son was a convicted murderer and was in prison with Okrah's brother. ([98.11] at 15). On the night of the rape, Okrah said Veasley's son told him and Okrah's brother about money and a vehicle that could be stolen from Veasley's home. ([98.11] at 15). Plaintiff claims Defendants had this information by June 2008. (Am. Compl. ¶ 25). Monitronics claims that Veasley's son would have provided helpful information or testimony. (See Am. Compl. ¶ 25). Carlock Copeland did not call Veasley's son as a witness at trial,

---

[6]     Monitronics states that Okrah's story is corroborated by the following facts: (1) Okrah apparently was not worried about "getting into trouble during the day while the external siren was going off loudly and repeatedly"; (2) Okrah's clothes were found in a second bedroom in Veasley's house; (3) Okrah remained in Veasley's home and fell asleep after assaulting her; (4) Veasley apparently was unconcerned by the tequila bottle, cell phone and rumpled bed that she saw when she arrived home. ([98.11] at 26).

suggesting that Defendants' failure to develop these facts may not have impacted the jury's verdict or that Carlock Copeland exercised its strategic prerogative not to call Veasley's son.  ([98.2] at 9).

Monitronics alleges that Defendants failed to interview or depose Veasley's neighbors, despite knowing "they had seen Okrah present in the neighborhood for some time before the assault."  (Am. Compl. ¶ 26).  Defendants "knew from law enforcement reports the identities of neighbors with knowledge of Okrah and his prior history in the neighborhood."  ([98.11] at 17).  Monitronics claims that Veasley's neighbors would have "corroborat[ed] that [Okrah] had been a tenant in the Veasley residence."  (Am. Compl. ¶ 26).  Carlock Copeland did not call Veasley's neighbors as witnesses at trial.  ([98.2] at 11).  Failure to do so may support that Carlock Copeland was negligent or that Carlock Copeland determined it was strategically beneficial not to call Veasley's neighbors as witnesses.

Monitronics alleges that Defendants failed to interview or depose the police officers who investigated the alarms or the officers who investigated the Okrah assault.  Defendants failed to obtain the police investigative files containing photographs, taken on the night of the assault, showing "apparent signs" that a man lived in Veasley's house.  (Am. Compl. ¶¶ 24-27).  This, Monitronics claims, also would have "corroborat[ed] Okrah's story that he had been living at the Veasley

home." (Am. Compl. ¶ 27). To the extent Monitronics did not seek at trial to apportion fault to the police, to introduce into evidence the photographs contained in the police investigative file, or to otherwise argue Okrah was permitted in Veasley's home, these omissions may have been negligent or based on strategic decisions made by Carlock Copeland.

Monitronics alleges that a Hall Booth attorney conducted an inadequate deposition of Veasley, including because the attorney failed to ask her questions about the Okrah assault, the sequence of events after she first saw Okrah, her emotional state after the incident,[7] her son's possible involvement in the incident, evidence suggesting Okrah lived with her, and her recorded admission to police that Okrah repeatedly asked her to leave the vehicle he was driving and that she refused to do so.[8] (Am. Compl. ¶¶ 28-30). Monitronics states that it did not introduce, at trial, Veasley's admission to the police because it did not know what Veasley would say about it. (Am. Compl. ¶ 30). Monitronics argues that Veasley's admission would have "dramatically altered the apportionment of fault

---

[7]    The Amended Complaint alleges that Defendants' failure to question Veasley about her emotional condition "permitted her attorney wide latitude to bolster damages by obtaining counseling for her (and damage testimony from counselor Claudia Fedarko) after her deposition" and more than four years after the rape occurred. (Am. Compl. ¶ 29).

[8]    Monitronics alleges that Defendants knew, by July 2008, about Veasley's taped admission to the police. ([98.11] at 20).

findings—away from [Monitronics] and to Ms. Veasley." (Am. Compl. ¶ 30).

Monitronics claims that Okrah's pre-existing relationship with Veasley, and his

possible tenancy in her home, would have undercut Veasley's case and resulted in

a verdict for Monitronics. (Am. Compl. ¶ 44). Carlock Copeland's decision not to

develop these facts or use this evidence at trial may have affected the jury's

verdict.

3.   <u>Failure to Timely Submit Apportionment of Liability Notices</u>

In July 2011, approximately two years after the Veasley lawsuit was filed,

Defendants filed notices of intent to apportion fault to Okrah, Warren, Warren's

husband, and Veasley's son. (Am. Compl. ¶¶ 19-20).[9]   The state court struck

these notices as untimely, precluding Monitronics from apportioning fault to these

individuals. (Am. Compl. ¶ 21). Monitronics argues that timely apportionment

notices by Defendants "would have eliminated or drastically reduced the award

against Monitronics." (Am. Compl. ¶ 46).[10] The documents Defendants seek to

have produced may show that Monitronics concluded apportionment would not

affect the jury's verdict in this case.

---

[9]     Monitronics did not call Warren's husband as a witness at trial. ([98.2] at
10).

[10]    Defendants allegedly were aware, from their July 21, 2010, deposition of
Warren, that Warren knew how to, but did not, contact Veasley on the date she was
raped. (Am. Compl. ¶ 20).

4.    <u>Failure to Properly Handle Expert Witnesses</u>

Monitronics alleges that Defendants took an inadequate deposition of Veasley's "highly impeachable industry expert," Jeffrey Zwirn ("Zwirn"),[11] and that this deprived Carlock Copeland of information to effectively cross-examine Zwirn at trial.  (Am. Compl. ¶ 31).  Monitronics alleges further that Defendants knowingly allowed the filing deadline for <u>Daubert</u> motions to pass, inadequately prepared Monitronics' O.C.G.A. § 9-11-30(b)(6) deponent for a deposition, and only designated Monitronics' industry expert, John Colehower ("Colehower"), at the last minute, resulting in "another unnecessary fight between Monitronics and Ms. Veasley's counsel."  (Am. Compl. ¶¶ 31-34).  Defendants seek to review documents that may discredit these claims or their impact on the jury verdict.

5.    <u>Expert Discovery Disputes</u>

Monitronics alleges that Defendants' conduct resulted in "four unnecessary and contentious hearings on expert discovery disputes" that ultimately led the state court to set an early trial date.  (Am. Compl. ¶ 35).  The trial court ordered Defendants to supplement their expert disclosures after Defendants refused to do so, ordered that Veasley be allowed to depose Colehower and Monitronics'

---

[11]    Monitronics states that Zwirn lacked education and training, and had a history of being prevented from testifying in prior cases.  ([98.11] at 21).

rebuttal expert, Peter Giacalone ("Giacalone"), after Defendants denied Veasley's request to do so, and imposed sanctions on Defendants for filing a frivolous motion to delay and micromanage the depositions of Colehower and Giacalone. (Am. Compl. ¶¶ 36-38).

The fourth discovery dispute occurred days later, when Fisher "stopped the [Giacalone] deposition before it ever began" and refused to call the court to resolve the issue. (Am. Compl. ¶¶ 39-40). Veasley filed an emergency motion to compel the deposition and Fisher, at a hearing on the motion, told the court that he cancelled the deposition because the parties disagreed on the issue of reserving objections. (Am. Compl. ¶ 40). The court imposed sanctions on Fisher and, to avoid further frivolous disputes, set the case for trial three months later. (Am. Compl. ¶ 40). Fisher later admitted to Culp & Dyer and others that he cancelled the deposition not because of a disagreement over objections but because delaying the deposition offered other tactical advantages. (Am. Compl. ¶¶ 41-42). Monitronics terminated Defendants shortly after this disclosure. (Am. Compl. ¶ 43). Defendants seek documents that may show evaluations of the impact of Fisher's conduct on the case.

E.     The Present Discovery Dispute

On February 16, 2016, Defendants served on Monitronics their First Request

for Production of Documents [22].  In early March 2016, Defendants served

document production subpoenas on the Nonparties.  ([27]; [28]).[12]  The subpoenas

served on Nonparty Law Firms requested all documents relating to (1) their

representation of Monitronics in the Veasley litigation, (2) Veasley's claims

against Monitronics, or (3) any filings, in the Georgia Supreme Court, arising out

of Veasley's claims against Monitronics.  The subpoenas served on Insurers

requested "the entire claim file(s)" for Veasley's claims against Monitronics, and

any related documents.  The discovery request served on Monitronics similarly

called for the production of documents related to the Veasley litigation.

In late March 2016, Monitronics [34], Carlock Copeland [33], and First

Mercury [36] objected to the document requests served on them.  Monitronics also

objected to each of the subpoenas served by Defendants on Nonparties.  (See

[37]-[40]; [42]).  On March 21, 2016, Holland & Knight filed its Objections to and

Motion to Quash the Subpoena Served by Defendant Hall, Booth, Smith, P.C. [43].

Monitronics and the Nonparties object to the document requests on the grounds

_____

[12]     On April 15, 2016, Defendants emailed the Court copies of the subpoenas
they served on Nonparties.

that the documents sought are protected by the attorney-client, work product or common interest privilege, and are not required to be produced.

On May 4, 2016, the parties and Nonparties submitted to the Court a joint statement of each entity's position on the discovery dispute.  ([103.2]).  At a May 23, 2016, teleconference with the parties and Nonparties, the Court instructed Defendants to make their document requests more specific and particularized.  ([68]).[13]  Pursuant to the Court's direction, on June 6, 2016, Defendants served their revised subpoenas [71] on Nonparties, and their Second Request for Production of Documents [70] on Monitronics.  (See [98.2]-[98.7]).  These requests include more than forty (40) discrete document requests concerning the following subjects (collectively, the "Requested Documents"):

1.   "All status reports, pre-trial reports, settlement evaluations or other documents prepared by [Nonparty Law Firms] to comply with either insurer's reporting requirements."

2.   Carlock Copeland's interview of Okrah, all efforts to interview or depose him, and any decisions or actions regarding his testimony, including the decision not to call him as a witness at trial.

3.   Interviews or depositions of police, decisions regarding their testimonies, the police investigative file, other documents obtained from police, and "[a]ny decisions made with respect to apportioning fault to the police."

---

[13]   Veasley also participated in the teleconference to discuss a separate discovery issue.

4.     The deposition of Claudia Fedarko, "including [documents] reflecting the reason for waiting until October to depose [her] and any decision making related to the timing of this deposition."

5.     The decision to request an independent medical examination of Veasley.

6.     The preparation of Monitronics' corporate representative for trial.

7.     Communications with Giacalone.

8.     Efforts to continue the deposition of Zwirn, and Monitronics' ability to effectively cross-examine him and control his direct examination at trial.

9.     Veasley's son, Warren's husband, and Veasley's neighbors, including the decision not to call these individuals as witnesses at trial.

10.    Monitronics' preparation to cross-examine Veasley at trial, including the decision not to ask her about her admission that she refused to leave Okrah when he asked her to do so.

11.    Security videos from the ATMs and McDonald's restaurant to which Okrah allegedly took Veasley on the night she was raped.

12.    Decisions regarding Okrah's cell phone records, including efforts to obtain the records.

13.    The decision to argue Tel-Star's fault at trial.

14.    Efforts to obtain a continuance of the Veasley trial, efforts to obtain a certificate of immediate review of the court's denial of Monitronics' motion for summary judgment, and "any decision making regarding" these issues.

15.    "[T]rial strategy and any decision made with respect to the evidence to be presented at trial."

16.     "[M]ock trial, jury roundtables or other similar evaluations" for the Veasley case.

17.     Settlement of the Veasley lawsuit.

18.     Invoices submitted by Nonparty Law Firms.

19.     Any agreement regarding the distribution of funds recovered in this malpractice lawsuit

20.     Copies of the Insurers' claim notes and insurance policies concerning the Veasley case.[14]

21.     Copies of "contracts or other agreements" between Culp & Dyer and Monitronics showing the relationship between those entities.[15]

(See [98.2]-[98.7]).[16]

On June 20, 2016, Monitronics, Insurers, Carlock Copeland, and

Holland & Knight served their responses and objections on Defendants.  ([72];

[75]-[78]; [80]).  Also on that day, Holland & Knight filed its Objections to and

Motion to Quash the Subpoena Served by Defendant Hall, Booth, Smith, P.C. [79].

The objections assert the attorney-client, work product and common interest

privileges for documents prepared after Defendants' withdrawal from the Veasley

---

[14]     Only the Insurers were served with this request.  ([98.6] at 4; [98.7] at 4).
[15]     Only Culp & Dyer was served with this request.  ([98.5] at 4).
[16]     The subpoena served on Holland & Knight requests only a subset of the Requested Documents.  It seeks documents concerning (1) efforts to comply with Insurers' reporting requirements, (2) settlement of the Veasley lawsuit, (3) Holland & Knight's invoices for its representation of Monitronics on appeal.  ([98.4]).

litigation.  ([97] at 4).  The parties and Nonparties generally have not identified for the Court the particular document requests to which objections have been made or the particular privilege on which each objection is based.[17]

On August 15, 2016, the Court ordered the parties and Nonparties to file memoranda regarding what is required to be produced in this malpractice action and, specifically, the impact of the attorney-client, work product and common interest privileges on the discovery and production obligations of parties, subsequent counsel and insurers in a legal malpractice case.  ([97]).  On August 29, 2016, the parties and Nonparties, other than Culp & Dyer, filed the required memoranda.  (See [98]-[103]).[18]  Defendants argue that Monitronics waived its attorney-client privilege over the Requested Documents because Monitronics affirmatively put the documents "at issue" and the documents are essential to Defendants' defense.  ([98] at 11-12).  Defendants also argue that they have "substantial need for [the requested fact work product] materials to prepare [their] case and cannot, without undue hardship, obtain their substantial equivalent

---

[17]    Only Holland & Knight and First Mercury have filed their responses and objections on the docket in this case.  ([77]; [79]).  First Mercury objects to thirteen requests.  ([77]).  Holland & Knight objects to the entirety of the shorter subpoena it received from Defendants.  ([79]).

[18]    On September 7, 2016, Monitronics filed its Notice of Filing of Corrective Brief [103], attaching a corrected version of the brief it filed on August 29, 2016.

by other means." Fed. R. Civ. P. 26(b)(3)(A)(ii); ([98] at 15). Defendants argue

further that they are entitled to discovery of Requested Documents that constitute

opinion work product "[b]ecause of the unique posture of this case and the

allegations made by Monitronics." ([98] at 18). Monitronics and the Nonparties

broadly claim that the Requested Documents are protected by applicable privileges

and are not required to be produced.

## II.    DISCUSSION

### A.    Monitronics' Attorney-Client Privilege

#### 1.    Introduction

"Parties may obtain discovery regarding any nonprivileged matter that is

relevant to any party's claim or defense and proportional to the needs of the case."

Fed. R. Civ. P. 26(b)(1). If a motion is timely filed, a court must quash or modify

a subpoena that "requires disclosure of privileged or other protected matter, if no

exception or waiver applies." Fed. R. Civ. P. 45(d)(3)(iii). Under Georgia law,

which controls here,[19] the attorney-client privilege "attaches where (1) there is an

---

[19]    "State law determines the attorney-client privilege in a diversity case." In Re Conagra Peanut Butter Products Liab. Litig., 1:07-md-1845, 2009 WL 799422, at *1 (N.D. Ga. Mar. 24, 2009); see Fed. R. Evid. 501 ("[I]n a civil case, state law governs privilege regarding a claim or defense for which state law supplies the rule of decision."). "Georgia's law of privilege controls in this case because the case is before the Court under diversity of citizenship jurisdiction and Georgia law

21

attorney-client relationship; (2) the communications in question relate to the

matters on which legal advice was sought; (3) the communications have been

maintained in confidence; and (4) no exceptions to privilege are applicable."

St. Simons Waterfront, LLC v. Hunter, Maclean, Exley & Dunn, P.C., 746 S.E.2d

98, 104 (Ga. 2013).  The attorney-client privilege belongs to the client and is solely

the client's to waive.  Osborn v. State, 504 S.E.2d 74, 77 (Ga. Ct. App. 1998).  The

client bears the burden of establishing the privilege.  S. Guar. Ins. Co. of Ga. v.

Ash, 383 S.E.2d 579, 583 (Ga. Ct. App. 1989).

Defendants do not dispute that they seek documents ordinarily protected by

the attorney-client privilege but argue that Monitronics impliedly waived its

otherwise valid privilege with respect to those documents.  If Monitronics has

waived its privilege, Defendants are entitled to discovery of documents that meet

the discoverability requirements of Rule 26(b) of the Federal Rules of Civil

Procedure.[20]

---

governs the resolution of the dispute."  McDonald v. H & S Homes, LLC, 5:08-cv-
298, 2009 WL 4251174, at *3 (M.D. Ga. Nov. 23, 2009).

[20]     Rule 26(b) provides a liberal scope for discovery allowing parties to "obtain
discovery regarding any nonprivileged matter that is relevant to any party's claim
or defense and proportional to the needs of the case."  Fed. R. Civ. P. 26(b)(1).

A party impliedly waives the attorney-client privilege where:

(1) [T]he party asserting the privilege affirmatively acted in a manner which resulted in the assertion of the privilege; (2) through the affirmative act, that party placed the protected information at issue by making it relevant to the case; and (3) application of the privilege would deny the opposing party access to information vital to its defense.

Christenbury v. Locke Lord Bissell & Liddell, LLP, 285 F.R.D. 675, 682 (N.D. Ga. 2012)  (citing Hearn v. Rhay, 68 F.R.D. 574 (E.D. Wash. 1975)); see Cox v. Adm'r U.S. Steel & Carnegie, 17 F.3d 1386, 1417 (11th Cir. 1994) ("[A]ttorney-client privilege is waived when a litigant places information protected by it in issue through some affirmative act for his own benefit, and to allow the privilege to protect against disclosure of such information would be manifestly unfair to the opposing party."  (internal quotation marks omitted) (quoting Conkling v. Turner, 883 F.2d 431, 434 (5th Cir. 1989))).[21]

"Georgia case law makes clear that, rather than broadly disfavoring waiver of attorney-client privilege, the courts confine the attorney-client privilege 'to its narrowest permissible limits.'"  Christenbury , 285 F.R.D. at 683 (quoting Tenet Healthcare Corporation v. Louisiana Forum Corporation, 538 S.E.2d 441, 444 (Ga.

---

[21]     "[O]n matters of privilege and waiver Georgia courts consider decisions of federal courts interpreting federal rules to be persuasive authority."  Christenbury, 285 F.R.D. at 682 (citations and quotation marks omitted).

2000)); see Camacho v. Nationwide Mut. Ins. Co., 287 F.R.D. 688, 692 (N.D. Ga.

2012) ("In Georgia, the attorney-client privilege is to be narrowly construed.").

This is because "a narrow construction of the privilege comports with the view that

the ascertainment of as many facts as possible leads to the truth, the discovery of

which is the object of all legal investigation." Tenet Healthcare, 538 S.E.2d at 444.

"The party who defends a discovery request on the basis of privilege has the

burden of establishing that the privilege has not been waived." Am. Family Life

Assur. Co. of Columbus v. Intervoice, Inc., No. 4:08-cv-167, 2010 WL 3000238, at

*2 (M.D. Ga. July 28, 2010); see In re Keeper of Records (Grand Jury Subpoena

Addressed to XYZ Corp.), 348 F.3d 16, 22 (1st Cir. 2003) ("[T]he party who

invokes the privilege bears the burden of establishing that it applies to the

communications at issue and that it has not been waived.").

　　　"[A] client impliedly waives [the privilege] when he accuses his attorney of

breach of contract or malpractice, affirmatively placing the subject matter of the

lawyer's representation at issue." Christenbury, 285 F.R.D. at 682; see id.

("Georgia courts have consistently affirmed that the attorney-client privilege may

be impliedly waived 'when a client charges negligence, malpractice or other

professional misconduct in an action against the attorney.'" (quoting

Waldrip v. Head, 532 S.E.2d 380, 386 (Ga. 2000))).  "[T]he client waives the

privilege to the extent necessary to allow the attorney to defend his or her own conduct against the charges of misconduct." Waldrip, 532 S.E.2d at 387. The attorney is "entitled only to [otherwise privileged] documents and files relevant to the specific allegations of [malpractice]." Id.

> 2. *Analysis*

In most malpractice cases involving implied waiver of the attorney-client privilege, the issue is whether the privilege between the plaintiff-client and the defendant-attorney has been waived. This case presents a different question. Monitronics has not asserted the attorney-client privilege over its communications with Defendants. Instead, Monitronics asserts the privilege with respect to its communications with *other* lawyers who worked on the Veasley case after Defendants were terminated. The question is whether Monitronics, by suing Defendants for malpractice, has waived its privilege with respect to these documents.

This issue was addressed in Lyon Fin. Servs., Inc. v. Vogler Law Firm, P.C., No. 10-cv-565, 2011 WL 3880948 (S.D. Ill. Sept. 2, 2011). Although Lyon is not controlling authority, it is instructive. In Lyon, the defendant-lawyers represented Lyon Financial Services, Inc. ("Lyon") in a separate civil action. Lyon terminated defendants before trial, based on their alleged misconduct during discovery. Lyon

then retained other counsel to represent Lyon at trial.  After the jury returned a verdict against Lyon, a still different law firm represented Lyon on appeal.  The case settled while on appeal, and Lyon sued defendants for malpractice in their representation of Lyon before trial.  Defendants filed a third-party complaint against the law firms that tried the case, alleging malpractice and professional negligence.  Defendants sought production of attorney-client communications between Lyon and its trial counsel, and Lyon and its appellate counsel.

Lyon argued that its communications with its trial or appellate counsel were not placed at issue because Lyon did not intend to use these communications to prove its allegations against defendants.  Lyon argued further that a waiver was precluded because defendants' alleged malpractice occurred "prior to and independently from" subsequent counsel's representation.  Id. at *3.  The court rejected these arguments, finding that Lyon put the communications at issue because (i) it sought damages for the amount of the verdict rendered after defendants were terminated, (ii) it implicitly argued that the effects of defendants' malpractice "continued beyond the duration of Defendants' representation," and (iii) "the specific party, if any, that caused Lyon's trial loss remain[ed] unresolved."  Id. at *3.  The court also found that, absent production of the attorney-client communications, defendants "would be effectively precluded from

challenging the causation and actual damages prongs for legal malpractice." Id. at *3.

The facts here are closely aligned with those in Lyon.  Monitronics has implicated the relevance of the Requested Documents because it alleges that Defendants were the sole proximate cause of the Veasley verdict,[22] even though Defendants were replaced by successor counsel months before the verdict was returned.  See Pappas v. Holloway, 787 P.2d 30, 36 (Wash. 1990) (en banc) (by asserting a malpractice claim against defendant-attorney, who withdrew from the underlying litigation one month before an adverse trial verdict, the plaintiff-clients waived the attorney-client privilege covering their communications with "all the attorneys who were involved in defending the [the plaintiff-clients] in the underlying litigation").  Defendants have asserted several affirmative defenses to Plaintiff's malpractice claim, including lack of causation and comparative negligence, and they have filed a notice seeking to apportion fault to successor counsel.  Cf. Christenbury, 285 F.R.D. at 683 ("[A] defendant-attorney can discover otherwise privileged communications between a client and other retained

---

[22]     "In a legal malpractice action, the plaintiff must establish three elements: (1) employment of the defendant attorney, (2) failure of the attorney to exercise ordinary care, skill and diligence, and (3) that such negligence was the proximate cause of damage to the plaintiff."  Cornwell v. Kirwan, S.E.2d 1, 3 (Ga. Ct. App. 2004).

counsel as a result of asserting comparative or contributory negligence and failure to mitigate damages defenses."); Carpenter v. Mohawk Indus., Inc., No. 4:07-cv-0049, 2007 WL 5971741, at *10 (N.D. Ga. Oct. 1, 2007) ("[W]aiver often occurs when a defendant raises an affirmative defense."). "It would undermine the most basic concepts of fairness to allow [Monitronics] to claim [Defendants are] liable for the entirety of their damages, while precluding the discovery of contrary evidence." Forever Green Athletic Fields, Inc. v. Babcock Law Firm, LLC, No. 11-cv-633, 2014 WL 29451, at *14 (M.D. La. Jan. 3, 2014).

The Court also finds that, subject to certain exceptions noted below, the Requested Documents are vital to Defendants' defense. The court in Lyon reasoned that, absent production of communications between the plaintiff-client and subsequent counsel, defendant-attorneys "would be effectively precluded from challenging the causation and actual damages prongs for legal malpractice," because they would not be allowed to advocate fully their defense that other persons were responsible, in whole or in part, for plaintiff's damages. Lyon, 2011 WL 3880948, at *3. Although some information about the trial and appellate proceedings is available in the public record, malpractice claims "involve examining decisions made at various stages of the underlying litigation," which "necessarily involve[s] information communicated between" client and counsel.

Pappas, 787 P.2d at 37.  Defendants here have been denied access to this information, including because their representation was terminated before trial.  Id. The Requested Documents include information about whether Nonparties cured or exacerbated Defendants' alleged pretrial deficiencies, or engaged in unrelated conduct or made independent litigation decisions that proximately caused or exacerbated Monitronics' alleged damages.  This information goes to the heart of Defendants' defense.  (See, e.g., [98] at 12 (Defendants argue that many of their alleged pretrial deficiencies "could have been cured during the three month period between Defendants' termination and the trial.")).

For example, if Monitronics' successor counsel chose not to engage in all or part of the discovery it claims Defendants should have conducted regarding Okrah, Veasley's son, Warren's husband, and Veasley's neighbors, the reason for not engaging in this discovery may discredit Monitronics' allegation that it was malpractice for Defendants not to do so.  If successor counsel was able to, but did not, procure ATM or McDonald's security video footage for March 29, 2006, that failure may have proximately caused some of Monitronics' damages.  If successor counsel made pretrial and trial decisions independent of the conduct Monitronics alleges constitutes malpractice, those decisions may undercut Monitronics' malpractice claim against Defendants.  It would be odd—if not unfair—to preclude

Defendants from discovering documents showing whether successor counsel or insurers had views of the evidence and trial presentation that aligned with Defendants'.  These kinds of strategy evaluation and litigation decision materials are largely, if not exclusively, the kind of documents maintained in the file of Monitronics and its lawyers and not available to Defendants unless produced.[23]

The Court finds, however, that the following kinds of Requested Documents are not necessary to Defendants' defense and thus are not required to be produced:

1. Requested Document category 1:  Status reports, pretrial reports or other documents that were prepared to comply with the Insurers' reporting requirements if the documents do not evaluate the evidence available to defend the Veasley case or the work of Defendants.  (See [98.2] at 6).

2. Requested Document category 17:  Documents concerning the settlement of the Veasley litigation unless the documents evaluate the merits, strengths or weaknesses of the case or the representation of Monitronics by Defendants.  (See [98.2] at 14-15).

---

[23] Some of the Requested Documents also are necessary to rebut specific allegations that Defendants' negligence adversely affected Monitronics' conduct at trial.  For example, the Amended Complaint states that Monitronics did not ask Veasley about allegedly critical issues on cross-examination because Defendants failed to ask her about the issues in her deposition.  (Am. Compl. ¶ 30). Monitronics states further that Defendants' deficient deposition of its expert witness, Zwirn, "impacted [Monitronics'] ability to control Zwirn's direct examination and to effectively cross-examine him at trial."  ([98.11] at 21). Defendants' access to documents bearing on the alleged connection between their negligence and Monitronics' conduct at trial is necessary to rebut Monitronics' allegations, and these documents are not available from sources other than Monitronics and Nonparties.

3.   Requested Document category 18:  Invoices submitted by Nonparty Law Firms.  (See [98.2] at 15).

4.   Requested Document category 19:  Agreements regarding the distribution of funds recovered in this malpractice lawsuit.  (See [98.2] at 15).

5.   Requested Document category 20:  The Insurers' claim notes and insurance policies concerning the Veasley case.  (See [98.6] at 4).

6.   Requested Document category 21:  Agreements between Culp & Dyer and Monitronics that demonstrate the relationship between those entities.  (See [98.5] at 4).

Subject to these six exceptions (collectively, the "Exceptions"), Monitronics has impliedly waived the attorney-client privilege that protected the Requested Documents.

B.   Fact Work Product

The Court next considers whether the fact work product privilege protects any of the Requested Documents from disclosure.  "Unlike the attorney-client privilege, federal law governs the work product doctrine, even in a diversity case." Peanut Butter Products, 2009 WL 799422, at *2.  "Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative."  Fed. R. Civ. P. 26(b)(3)(A).  These work product materials may, however, be discovered where "the party shows that it has substantial need for the materials to prepare its case

31

and cannot, without undue hardship, obtain their substantial equivalent by other means."  Fed. R. Civ. P. 26(b)(3)(A)(ii).  This showing is analogous to that required by the implied waiver test.  The Court finds that Defendants are entitled to discovery of the Requested Documents that constitute fact work product,[24] subject to the Exceptions listed at the conclusion of the attorney-client privilege waiver section in this Order.

C.   Opinion Work Product

Rule 26 provides that, even where discovery of fact work product is permitted, the court "must protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation."  Fed. R. Civ. P. 26(b)(3)(B).  These materials, known as opinion work product, "enjoy[] nearly absolute immunity and can be discovered only in very rare and extraordinary circumstances," such as where they were created to further a crime or fraud.  Cox, 17 F.3d at 1422 (citation and internal quotation marks omitted).

It is not possible for the Court to determine, in the abstract, which, if any, of the Requested Documents constitute opinion work product and whether these documents are required to be produced.  If opinion work product is claimed as a

---

[24]   This includes Insurers' fact work product.

reason to refuse production of a Requested Document otherwise required by this
Order to be produced, the withholding entity shall deliver to the Court, for
*in camera* review, an unredacted copy of the document withheld. The withholding
entity shall clearly identify for the Court the portion of the document allegedly
protected by the opinion work product privilege. These documents shall be
delivered to the Court on or before December 14, 2016.

  D. <u>Common Interest Privilege</u>

  "The common interest privilege is an exception to the general rule that
disclosure of documents protected by the work product doctrine or attorney client
privilege constitutes a waiver of the protection." <u>Jones v. Tauber & Balser, P.C.</u>,
503 B.R. 510, 517 (N.D. Ga. 2013). "Parties who share 'strong common interests'
may also share privileged or protected material without waiving the privilege or
protection." <u>Id.</u>

> The "common interest" privilege, also known as the joint defense
> privilege, applies where (1) the communication is made by separate
> parties in the course of a matter of common interest; (2) the
> communication is designed to further that effort; and (3) the privilege
> has not been waived. The privilege does not require a complete unity
> of interests among the participants, and it may apply where the
> parties' interests are adverse in substantial respects.

<u>McKesson Corp. v. Green</u>, 597 S.E.2d 447, 452 n.8 (Ga. Ct. App. 2004),
<u>aff'd,</u> 279 Ga. 95, 610 S.E.2d 54 (2005).

Where privileged documents about a matter of common interest are shared among entities united by strong common interests, and where the privilege has not otherwise been waived, the privileged materials are not required to be produced just because they were shared among the entities.  Here the Court has found that Monitronics waived its attorney-client privilege for the Requested Documents, subject to the Exceptions described above.  The common interest doctrine does not protect these otherwise unprotected documents.  The common interest doctrine also does not preclude the production of work product materials that satisfy the requirements of Federal Rule of Civil Procedure 26(b)(3)(A).[25]

E.    Insurers' Attorney-Client Privilege

The Insurers argue that Defendants are not entitled to discovery of Insurers' communications with their counsel because those communications are protected by Insurers' own attorney-client privilege, which has not been waived.  ([101]; [103.2] at 7).  Defendants do not argue that this privilege has been waived,[26] and

---

[25]    The parties and Nonparties barely discuss the common interest privilege in their filings.  Monitronics' principal argument on this issue is that the common interest doctrine preserves the work product privilege with respect to materials shared among Monitronics and Nonparties, including between Nonparty Law Firms and Insurers.  ([103.2] at 2-4).

[26]    "Hall Booth makes no claim of waiver by the Insurers."  ([101] at 8).  "In fact, Hall Booth did not even require First Mercury to log its attorney-client communications."  ([101] at 6).

the Insurers have not sued Defendants or affirmatively put their own attorney-client communications at issue.  Accordingly, the Court finds that the Insurers have not waived their independently held attorney-client privilege over their confidential communications with their counsel, and the Insurers are not required to produce the Requested Documents protected by this privilege.

F.      NonParty Costs of Responding to the Subpoenas

Scottsdale, Carlock & Copeland, and Holland & Knight seek reimbursement from Defendants for the costs incurred in responding to Defendants' subpoenas. (See [79.1] at 11; [103.2] at 6-7).

Generally, "the responding party must bear the expense of complying with discovery requests." Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 358 (1978).  Rule 45(d)(2)(B)(ii) of the Federal Rules of Civil Procedure, however, "requires the district court to shift a *non-party's* costs of compliance with a subpoena, if those costs are significant." Legal Voice v. Stormans Inc., 738 F.3d 1178, 1184 (9th Cir. 2013) (emphasis added); see Hernandez v. Hendrix Produce, Inc., No. 613-cv-053, 2014 WL 953503, at *2 n.5 (S.D. Ga. Mar. 10, 2014) ("[P]laintiffs are reminded that this Court *must* shift to them any non-party's subpoena compliance costs if they are significant.").  "[W]hen discovery is ordered against a non-party, the only question before the court in considering whether to

shift costs is whether the subpoena imposes significant expense on the non-party. If so, the district court must order the party seeking discovery to bear at least enough of the cost of compliance to render the remainder non-significant." Id.

The Nonparties have not provided information about their compliance costs for the Court to determine if, or how much, reimbursement is appropriate. Accordingly, the requests for reimbursement are denied.

## III.   THE SCOPE OF THE REQUIRED PRODUCTIONS

Having reviewed Defendants' document requests based on the analysis conducted in this Order, the Court finds that the subjects are required to be refined to adequately describe the documents to be produced.  To avoid still further disputes about the production required by this Order, the Court lists specifically the documents that must be produced.

Monitronics, Insurers, Culp & Dyer and Carlock & Copeland must produce, on or before December 14, 2016, documents referring or relating to, or containing, the following subjects (collectively, the "Production Categories"):

1.   Status reports, pretrial reports and evaluations concerning the evidence available to defend the Velma Veasley case or the work of Defendants.

2.   Carlock Copeland's interview of Stephen Okrah, efforts to interview or depose him, and evaluations, decisions or actions regarding his testimony, including the decision whether to call him as a witness at trial.

3.     Interviews or depositions of police personnel, decisions regarding their testimonies, documents prepared by, or obtained from, police personnel, and any documents discussing or evaluating the responsibility, if any, of police personnel for the Velma Veasley incident on March 29, 2006.

4.     The deposition of Claudia Fedarko, including documents relating to the timing of the deposition.

5.     The decision to request an independent medical examination of Velma Veasley.

6.     The preparation of Monitronics' corporate representative for trial.

7.     Communications with Peter Giacalone.

8.     The deposition of Jeffrey Zwirn and Monitronics' examination of him at trial.

9.     Jeremy Veasley, Frank Warren, and Velma Veasley's neighbors, including contact with these individuals and whether to call them as witnesses.

10.    Monitronics' preparation to cross-examine Velma Veasley at trial, including whether to ask her about her admission that she refused to leave Stephen Okrah on March 29, 2006.

11.    Security videos from the ATMs and McDonald's restaurant to which Stephen Okrah allegedly took Velma Veasley on March 29, 2006.

12.    Stephen Okrah's cell phone records.

13.    Whether to contend at trial that Tel-Star Alarms, Inc. was responsible for Velma Veasley's injuries or damages.

14.     Efforts to obtain a continuance of the Velma Veasley trial and/or a certificate of immediate review of the court's denial of Monitronics' motion for summary judgment.

15.     The strategy to be used at trial and the evidence to be presented and not presented at trial.

16.     Mock trial, jury roundtables or other similar evaluations of the Velma Veasley claims against Monitronics.

Holland & Knight must produce, on or before December 14, 2016,

documents responsive to Production Category 1.[27]

## IV.    CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Plaintiff Monitronics International, Inc.

("Monitronics"), Carlock Copeland & Stair LLP ("Carlock Copeland"),

Culp & Dyer LLP ("Culp & Dyer"), Nationwide Mutual Insurance Company f/k/a

Scottsdale Insurance Company ("Scottsdale"), and First Mercury Insurance

Company ("First Mercury") shall produce, on or before December 14, 2016,

documents referring or relating to, or containing, the following subjects

(collectively, the "Production Categories"):

---

[27]     Documents protected by the Insurers' attorney-client privilege are not required to be produced.  Documents claimed to be protected by the opinion work product privilege shall be delivered to the Court, on or before December 14, 2016, for *in camera* review.  The documents must clearly identify the opinion work product claimed to be protected.

1.     Status reports, pretrial reports and evaluations concerning the evidence available to defend the Velma Veasley case or the work of Defendants.

2.     Carlock Copeland's interview of Stephen Okrah, efforts to interview or depose him, and evaluations, decisions or actions regarding his testimony, including the decision whether to call him as a witness at trial.

3.     Interviews or depositions of police personnel, decisions regarding their testimonies, documents prepared by, or obtained from, police personnel, and any documents discussing or evaluating the responsibility, if any, of police personnel for the Velma Veasley incident on March 29, 2006.

4.     The deposition of Claudia Fedarko, including documents relating to the timing of the deposition.

5.     The decision to request an independent medical examination of Velma Veasley.

6.     The preparation of Monitronics' corporate representative for trial.

7.     Communications with Peter Giacalone.

8.     The deposition of Jeffrey Zwirn and Monitronics' examination of him at trial.

9.     Jeremy Veasley, Frank Warren, and Velma Veasley's neighbors, including contact with these individuals and whether to call them as witnesses.

10.    Monitronics' preparation to cross-examine Velma Veasley at trial, including whether to ask her about her admission that she refused to leave Stephen Okrah on March 29, 2006.

11.    Security videos from the ATMs and McDonald's restaurant to which Stephen Okrah allegedly took Velma Veasley on March 29, 2006.

12.     Stephen Okrah's cell phone records.

13.     Whether to contend at trial that Tel-Star Alarms, Inc. was responsible for Velma Veasley's injuries or damages.

14.     Efforts to obtain a continuance of the Velma Veasley trial and/or a certificate of immediate review of the court's denial of Monitronics' motion for summary judgment.

15.     The strategy to be used at trial and the evidence to be presented and not presented at trial.

16.     Mock trial, jury roundtables or other similar evaluations of the Velma Veasley claims against Monitronics.

**IT IS FURTHER ORDERED** that Holland & Knight LLP ("Holland & Knight") shall produce, on or before December 14, 2016, documents responsive to Production Category 1.

**IT IS FURTHER ORDERED** that if Monitronics or Nonparties assert that any of the documents required by this Order to be produced contain opinion work product, the documents shall be delivered, on or before December 14, 2016, to the Court for its *in camera* review.  The withholding entity shall clearly identify the portion of the document allegedly protected by the opinion work product privilege.

**IT IS FURTHER ORDERED** that documents protected by the attorney-client privilege held by First Mercury or Scottsdale are not required to be produced.

40

**IT IS FURTHER ORDERED** that Defendants are not required to reimburse the Nonparties for the costs they incurred in making the production required by this Order or in otherwise responding to Defendants' March 8, 2016, and June 6, 2016, subpoenas.  ([27]; [98.3]-[98.7]).

**IT IS FURTHER ORDERED** that Holland & Knight's Objections to and Motion to Quash the Subpoena Served by Defendant Hall, Booth, Smith, P.C. [79] is **GRANTED IN PART** and **DENIED IN PART**.  It is **GRANTED** to the extent that Holland & Knight is not required to produce documents other than those responsive to Production Category 1.  It is **DENIED** to the extent that Holland & Knight is required to produce documents responsive to Production Category 1.  It is **DENIED** in that Defendants are not required to reimburse Holland & Knight for the costs incurred in making the production required by this Order or in otherwise responding to Defendants' March 8, 2016 and June 6, 2016, subpoenas.  ([27], [98.4]).

**IT IS FURTHER ORDERED** that Holland & Knight Objections to and Motion to Quash the Subpoena Served by Defendant Hall, Booth, Smith, P.C. [43] is **DENIED AS MOOT**.[28]

---

[28]    This motion sought to quash Defendants' March 8, 2016, subpoena, which was later superseded by Defendants' June 6, 2016, subpoena.

**SO ORDERED** this 2nd day of December, 2016.


_____
WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE